**Joseph D. PIKE, Petitioner–Appellee,**

**MedApproach, L.P., Jeffrey L. Rush, M.D., Bio–Pharm Investment, Inc., Danco Investors Group, a/k/a Neogen Holdings, L.P. N.D. Management, Inc., Danco Holdings, L.P. a/k/a Neogen**

---

**8.** Accordingly, we also deny Leventhal's request under 42 U.S.C. § 1988 for attorneys' fees.

Holdings, L.P. Danco Laboratories, Inc., Danco Pharmaceuticals, Inc. a/k/a Neogen Pharmaceuticals, Inc., Respondents–Appellees,

v.

Brian M. FREEMAN, Respondent–Appellant.

Docket No. 00–9161.

United States Court of Appeals, Second Circuit.

Argued April 9, 2001.

Decided Sept. 26, 2001.

John K. Crossman, Zevnik Horton Guibord McGovern Palmer & Fognani, L.L.P., New York, NY, for petitioner-appellee.

W. Gary Blackburn, Blackburn & McCune, P.C., Nashville, TN, for respondents-appellees.

Richard De Palma, Coudert Brothers, New York, NY, for respondent-appellant.

Before WALKER, Chief Judge, McLAUGHLIN, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Respondent-appellant Brian M. Freeman appeals from a judgment of the United States District Court for the Southern District of New York (Richard C. Casey, *Judge*) granting petitioner-appellee Joseph D. Pike's motion to confirm a July 15, 1999 arbitration award against respondents. In particular, Freeman challenges (1) the portion of the award finding him liable as a general partner of co-respon-

dent Danco Investors Group, L.P., and (2) the district court's dismissal with prejudice of his counterclaim and cross-claims for indemnification based upon a finding that he waived those claims by failing to assert them in the arbitration. We agree with the district court that Freeman failed to demonstrate that the challenged portion of the arbitral award should be set aside. With respect to the district court's dismissal with prejudice of Freeman's indemnification counterclaim and cross-claims, however, we find that the district court's analysis of the counterclaim is based on an erroneous assumption, and that the district court erred in concluding that Freeman waived his indemnification claims by not asserting them in the arbitration. Consequently we vacate the dismissal with prejudice of Freeman's indemnification claims and remand for further proceedings consistent with this opinion.

## BACKGROUND

The matter submitted to arbitration involved a dispute among Pike, Freeman, and other individuals and entities involved in a project to manufacture, distribute, and market an abortion-inducing drug in the United States (the "Project"). The patent for the drug in the United States is owned by a non-profit organization, The Population Council, which retained private entrepreneurs to carry out the Project.

Pike was initially the individual selected to be in charge of the Project. Given the Project's potentially controversial nature, Pike set up a complicated corporate structure to shield from publicity the entities playing key roles in the Project. As a result, those who invested in the Project did so by purchasing limited partnership interests in respondent Danco Investors Group, also known as Neogen Holdings, L.P. (the "Partnership"). The Partnership's general partner was respondent

N.D. Management, Inc. ("N.D.Management").

## I. The Engagement Contract

For reasons not relevant here, The Population Council eventually decided that Pike should extricate himself from any position of control within the Project. In connection therewith, Pike, individually and on behalf of N.D. Management, the Partnership, and "affiliated entities," hired appellant Brian M. Freeman's company, Brian M. Freeman Enterprises, Inc. ("BMF Enterprises"), to be the agent in negotiating and selling Pike's controlling interest in the various entities involved in the Project. Pike's retention of BMF Enterprises was documented in an engagement contract dated November 3, 1996 (the "Engagement").

## II. The Agreement

In January 1997, Pike entered into an agreement to sell 75% of his 100% interest in N.D. Management to respondent MedApproach, L.P. and other "Participating Investors" (the "January Agreement"). In return for the sale and for fulfilling other obligations, Pike was to receive certain payments. Freeman, in addition to his role as the principal of BMF Enterprises, was listed in the January Agreement as one of the "Participating Investors" in the Project. The January Agreement also provided that, with respect to Pike's remaining interests, such as his remaining 25% interest in N.D. Management, Pike was to provide Freeman and two other individuals "an exclusive and irrevocable proxy and power of attorney ... for all rights with respect to voting of stock or partnership interests in N.D. Management, Inc., [and] Neogen Industries, Inc., which shall also include all control, management and financial functions of each of

the Pike Entities and the Project."[1] Freeman signed the January Agreement.

The January Agreement contained the following arbitration clause: "Any disputes hereunder shall be resolved by: binding arbitration by American Arbitration Association in New York City on an expedited basis."

The January Agreement was amended on February 5, 1997. Although the definition of "Participating Investors" was not changed, paragraph 10 of the amendment purported to exclude Freeman to a significant extent from the arrangements set up in the January Agreement, while leaving him responsible for certain specific obligations, including his duties as a proxy holder and holder of a power of attorney and his duty as a "Participating Investor" to make up any shortfall in investments received for the Project.

The January Agreement, amended on February 5, was again amended on or about February 12, 1997 (collectively, the "Agreement"). The February 12 amendment provided in relevant part that certain payments to Pike under the Agreement were to be given instead to BMF Enterprises to satisfy certain of Pike's obligations to BMF Enterprises under the Engagement. The February 12 amendment added, however, that "the remaining sections of the Engagement, remain in full force and effect."

### III. The Arbitration

After a dispute subsequently arose as to whether Pike had performed his obligations under the Agreement and whether he was entitled to receive the payments promised to him thereunder, Pike sent a demand for arbitration on September 21, 1998, alleging "the respondents' breach of the Agreement." Freeman was one of the named respondents and was described as an "individual." Respondents filed an answer dated November 5, 1998, asserting as the Twenty Second Affirmative Defense: "As to all claims ... Freeman ... [is] not properly before this tribunal for arbitration in that there are no agreements conferring such jurisdiction." Respondents, including Freeman, then participated in the selection of arbitrators and, eventually, in discovery. In February 1999, following a preliminary hearing, the arbitrators issued an order indicating that the parties had agreed that no explanatory supporting opinion would be provided when the arbitrators issued their ruling.

On March 1, 1999, Pike filed a "Written Specification of Affirmative Claims," which provided a summary of the breaches of the Agreement alleged by Pike:

> Mr. Pike agreed to relinquish control and approximately 75% of his financial stake in the Project in return for $3,500,000 and an agreement by respondents to indemnify Mr. Pike for expenses incurred in connection with his role in the Project. Also, respondents promised Mr. Pike a position as a consultant for five years, with appropriate support and an annual salary of $300,000. Finally and most importantly, respondents assured Mr. Pike that they would protect the Project and the investors by purchasing any limited partner interests tendered in connection with a rescission offer they would make, and that they would contribute additional financing of $14,000,000.

1. The "Pike Entities" were Neogen Holdings, LP, Neogen Investors, LP, Neogen Pharmaceuticals, Inc., Danco Laboratories, Inc., N.D. Management, Neogen Industries, Inc., and "any and all other entities owned or controlled directly or indirectly by Pike related to the Project."

Respondents have failed to fulfill any of these obligations. . . .

The indemnification that Pike sought for expenses "in connection with his role in the Project" consisted of attorneys' fees and costs Pike incurred in obtaining dismissals or stays of lawsuits brought against him by certain respondents in late 1997 and 1998—lawsuits Pike claimed should have been arbitrated. In addition, Pike sought "[a]n award of all costs in this arbitration proceeding, including attorneys' fees."

In a motion dated the same day, Freeman and co-respondents Jeffrey L. Rush and Bio–Pharm Investment, Inc. moved to dismiss the arbitration for lack of jurisdiction. The supporting memorandum of law stated that by virtue of Paragraph 10 of the February 5 amendment to the January Agreement, "Freeman [and the other movants] are not parties to any contract on which the instant Arbitration is based and thus have not consented to participate in this Arbitration." In opposition, Pike argued that Freeman and the other movants had waived their right to move to dismiss under New York State law by failing timely to object to the demand for arbitration. Freeman and the other movants subsequently filed a supplemental memorandum of law dated March 12, 1999, arguing that their objection was not waived, and that even if, under relevant state law, *judicial* review of arbitrability had been waived by failing to object sooner:

> [Movants] have not waived the right to adjudication of this issue before the arbitrators. The arbitration clause in the January 21, 1997, Agreement provides that "[a]ny disputes hereunder shall be resolved by: binding arbitration by American Arbitration Association in New York City on an expedited basis." *Whether the operative provisions of the Agreement, including the arbitration clause thereof, apply to Movants is a*

*"dispute hereunder"* to be resolved in this arbitration. *First Options of Chicago v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 1923–24, 131 L.Ed.2d 985 (1995); *PaineWebber, Inc. v. Bybyk,* 81 F.3d 1193, 1198–1200 (2d Cir.1996). As the Court stated in *Nationwide General Ins. Co. v. Investors Ins. Co. of America,* 37 N.Y.2d 91, 96, 371 N.Y.S.2d 463, 467, 332 N.E.2d 333 (1975), "[p]enetrating definitive analysis of the scope of the agreement must be left to the arbitrators whenever the parties have broadly agreed that *any* dispute involving the interpretation and meaning of the agreement should be submitted to arbitration."

(Emphasis added.) The movants concluded by stating that they

> were not required to and are not precluded from raising this issue in the arbitration. Movants timely and specifically asserted the defense of non-arbitrability in their Answer (Twenty Second Affirmative Defense) and have not waived this issue by appearing before the arbitrators on a motion to dismiss.

On March 16, 1999, the arbitrators denied the motion to dismiss "without prejudice to these respondents' right to seek to prove, at the hearing, should that be deemed by them to be desirable, that they have no liability for any sums that might be awarded at the conclusion of this arbitration proceeding."

In May 1999, an eleven-day evidentiary hearing was held, during which Freeman testified. In his opening statement, Pike's counsel asserted that

> we're asking in particular that Mr. Freeman—his portion of all of this personally and that the award that is entered should—for any obligation of even the limited partnership, we contend is a direct personal obligation of Mr. Freeman as a general partner. You'll say to me,

but he's a limited partner, why would he be a general partner. We put in our brief and explained the HA Law (phonetic) where a limited partner undertakes to manage the business, decide when the general partner can resign and quit, etcetera, that they become at all a general partner and we'll show you buckets of correspondence and just countless acts, documents signed by Mr. Freeman in his own name, on behalf of the limited partnership.

Subsequently, Pike filed a post-hearing brief dated June 10, 1999. In that brief, Pike again asserted that any money for which the Partnership was to be found liable should, in the event the Partnership was unable to pay it, be the responsibility of its general partners, whom Pike identified as MedApproach, Bio–Pharm, and Freeman. While MedApproach was identified as the "express general partner," Pike also claimed that Freeman was "liable as a general partner" because he was a limited partner who "took part in the control of the business of the partnership." According to Pike, a limited partner who exercises such control becomes personally liable as a general partner under California and New York partnership law.[2]

Respondents filed an opposing brief on June 17, 1999. They claimed that (1) Freeman was not actually a limited partner, but was only "a trustee of a limited partner," and, in any event, (2) the provisions of partnership law relied upon by Pike had been superseded and now required the party suing to have a reasonable belief that a limited partner exercising control of a partnership was actually a general partner. Respondents argued that, although the evidence of Freeman's

control of the partnership offered at the hearing was undisputed, Pike could not have had such a reasonable belief because Pike, not Freeman, had been the one who sold his interest in the general partnership to MedApproach, and thus knew how the entities were structured—at least as of February 1997.

In an award dated July 15, 1999 (the "Award"), the arbitrators found in favor of Pike. Of particular concern to Freeman was the portion of the Award that indemnified Pike for several hundred thousand dollars in attorney's fees and costs, payment of which was ordered to be the

> responsibility, jointly and severally, of N.D. Management, Inc., Danco Laboratories, Inc., Danco Pharmaceuticals, Inc., Neogen Holdings, L.P. aka Danco Holdings, L.P. and Danco Investors Group, L.P. aka Neogen Investors, L.P. By his actions as proved during this proceeding, it is determined that Respondent Brian M. Freeman is a general partner of Danco Investors Group, L.P.

MedApproach, Freeman, and Rush were thus ordered to provide sufficient funds to the Partnership by September 10, 1999, to allow it to make the required payments, "[t]he proportion of such funds to be provided respectively by MedApproach, Freeman and Rush ... in the ratio of 50:25:25, unless otherwise agreed among them."[3]

In addition, the Award ordered Freeman and the other respondents to pay a total of $70,000 for "dilatory and bad faith conduct in this arbitration, including but not limited to the promulgation of frivolous claims, the failure to comply with procedural orders, and the late production of required documents." The Award also or-

---

**2.** The post-hearing brief also asserted that Freeman was personally liable for certain breaches of the obligations of "Participating Investors" under the Agreement.

**3.** The Award did not grant all of the fees and costs sought by Pike and, in particular, did not grant him the costs and fees associated with the arbitration.

dered that MedApproach and the individual respondents Rush and Freeman were jointly and severally responsible for paying $700,000 in consulting fees to Pike as required by the Agreement.

Following the issuance of the Award, Pike commenced a proceeding to confirm it in New York state court, which was removed by defendant Neogen Holdings, L.P. to federal court on the basis of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–205.[4] Freeman then filed (1) a motion to vacate the Award; (2) a counterclaim against Pike seeking indemnification for payment of the Award under the terms of the Engagement; and (3) cross-claims against the other respondents seeking indemnification under the Agreement.

**4.** Although Pike moved to remand the action to state court, the district court denied the motion and correctly held that federal subject matter jurisdiction existed under the Convention. *See* 9 U.S.C. § 203. We have held that three basic requirements must be met for a district court to establish jurisdiction under the Convention: "[T]he award (1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993) (internal quotation marks omitted). The court found that the first element was undisputed, except for Freeman's contention that he was not a party to the Agreement for the purposes of the arbitration clause, and that the second element was also undisputed. The court found that the third element was met because it credited Freeman's representation that N.D. Management, Danco Holdings, L.P., and Danco Laboratories, Inc. were "Cayman Island corporations with their principal places of business located in Georgetown, Grand Cayman," indicating that the award did not simply arise "out of [a legal] relationship which is entirely between citizens of the United States." 9 U.S.C. § 202.

With respect to Freeman's status as a party to the Agreement, because Freeman had conceded that "[w]hether the operative provisions of the Agreement, including the arbitration clause thereof, apply to Movants is a

At argument before the district court, Pike's attorney again argued that

the simple fact, which was proved at the arbitration, and which we have submitted the evidence [of] in our papers, is that Freeman was functioning as a general partner of this operation. He was the moving force. He negotiated everything. He had his finger on all of the financials. He was writing all the letters. There is a huge litany of things that he admitted during the arbitration that he was doing. And as a matter of fact, he was functioning as and chargeable as a general partner. Whether he has any rights as a general partner, frankly, we could care less. But he certainly has the responsibilities and the liabilities.

'dispute hereunder,' to be resolved in this arbitration," and the arbitrators had determined that Freeman was a party to the arbitration clause, the court affirmed the arbitrators' decision. This Court has held that "[a]lthough a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct." *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) (finding such agreement to be implied based on non-signatories' "active and voluntary participation in the arbitration," as well as the fact that they had not "objected to the process, refused to arbitrate or made any attempt to seek judicial relief"). While Freeman had claimed that the arbitrators had no jurisdiction over him, he did not object to the process by which the arbitrator, rather than a court, resolved the question of his status as a party to the agreement to arbitrate, did not refuse to arbitrate, and did not seek judicial relief from having to participate in the arbitration. *See Gvozdenovic*, 933 F.2d at 1105.

At oral argument on the instant appeal, Freeman's counsel conceded that Freeman had submitted the question of his status as a party to the Agreement to the arbitrators to decide, and stated that Freeman was not objecting on appeal to the arbitrators' finding that he was a party to the Agreement.

On June 30, 2000, in an oral decision, Judge Casey confirmed the award in its entirety. The district court also dismissed with prejudice Freeman's counterclaim against Pike for indemnification and Freeman's cross-claims against the other respondents for indemnification on the ground that Freeman had waived them by failing to assert them in the arbitration. Judgment was entered on August 18, 2000, and this appeal followed.

## DISCUSSION

 In reviewing a district court's confirmation of an arbitral award, we review legal issues *de novo* and findings of fact for clear error. *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir.1997). Federal court review of an arbitral judgment is highly deferential; such judgments are to be reversed only where the arbitrators have exceeded their authority or made a finding in manifest disregard of the law. *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 515 (2d Cir.1991). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In determining whether arbitrators have "manifestly disregarded the law," we have held that there must be something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law, in order to sustain a finding of manifest disregard of the law. Illustrative of the degree of "disregard" necessary to support vacatur under this standard is our holding that manifest disregard will be found where an arbitrator understood and correctly stated the law but proceeded to ignore it.

*Fahnestock*, 935 F.2d at 516 (internal citation and quotation marks omitted); *see also Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111–12 (2d Cir.1993) ("[C]ourts may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation.... Moreover, the law ignored by the arbitrators must be well defined, explicit, and clearly applicable if the award is to be vacated.") (internal quotation marks omitted). Here, the arbitrators did not exceed their authority nor did they manifestly disregard the law.

## I. Freeman's Liability

 Freeman claims that the arbitrators exceeded their authority in deciding that he was a limited partner liable as a general partner because the Agreement containing the arbitration clause did not address whether Freeman was a limited partner.[5] This claim lacks merit because, in deciding the extent to which respondents caused injury to Pike, it was well within the scope of the arbitration clause for the arbitrators to decide under what theory or theories Freeman should or could be held liable for the damage suffered.

---

5. Freeman also argues that, because neither the partnership agreements nor the other limited partners were before the arbitrators, the arbitrators exceeded their authority by finding that he was an actual general partner, rather than merely liable as though he were a general partner. He rests his claim that the arbitrators found him to be an actual general partner on the Award's statement that "Freeman is a general partner." We disagree that this statement must be given the interpretation advanced by Freeman. Read in the context of the entire Award, this language is reasonably interpreted to state that Freeman is to be held liable as a general partner.

Freeman further claims that he cannot be liable as a general partner because he was not even a limited partner but instead a trustee of two trusts that were limited partners. Pike asserted in the arbitration, however, that Freeman, as an individual, was a limited partner. The record, somewhat surprisingly, contains no official corporate document comprehensively setting forth the limited partners of the partnership.[6] The arbitrators were thus left with the competing arguments of the parties and sparse documentary evidence. In examining that evidence, we note that while the names of the trusts do not appear in the Agreement, the Agreement and associated documents contain several passages suggesting that Freeman individually was a limited partner.[7] Thus, the arbitrators were entitled to reach a conclusion on liability that required, as a precondition, that Freeman be a limited partner of the Partnership.

■ We similarly reject Freeman's claim that the arbitrators manifestly disregarded the law in finding him liable for the amounts specified in the Award. Freeman maintains that his official legal roles in the Project entities do not allow for a finding that he is personally liable for the amounts awarded. In particular, he contends that, under the relevant partnership law, he could not be liable as a general partner unless he was a limited partner who Pike

reasonably believed was acting as the general partner. We observe, however, that one of the key issues during the arbitration hearing with respect to Freeman was the extent to which Freeman's actual participation in the entities at issue differed from the official arrangements set forth in the Agreement and other documents. Freeman's testimony during the arbitration hearing detailed an extensive list of activities Freeman carried out involving the control and management of the general partner, after Pike had relinquished control. While Freeman argued that such activities were carried out as an "advisor" to the general partner, among other roles, the arbitrators were entitled to determine that, after Pike relinquished control, he reasonably could have perceived such activities as evidence that Freeman was acting as a general partner. Indeed, where, as here, no explanatory opinion accompanies the award, "[i]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed." *Fahnestock*, 935 F.2d at 516. Based on the facts of this case—as determined by the arbitrators' interpretation of a somewhat convoluted, inconsistent, and incomplete documentary and testimonial record—we cannot say that no grounds exist to support the arbitrators' decision.

In any event, Freeman has not explained why partnership law provides the

---

6. The document upon which Freeman relies is simply a facsimile sent by Pike in April 1997 entitled "Investors Contacts," which lists the two trusts and states that Brian M. Freeman is their trustee.

7. For example, "Participating Investors" in the January Agreement is defined as "MedApproach, Richard S. Cusac, William S. Elkus, *Brian M. Freeman* and Jeffrey L. Rush, M.D. and such of the *other limited partners* of Neogen Investors." (Emphasis added.) Similarly, the "Irrevocable Proxy and Power of Attorney" executed pursuant to the Agreement in

favor of certain "Holders," one of whom is Freeman as an individual, refers to the Agreement as being between Pike, "the Holders and certain *other limited partners* of" the Partnership. (Emphasis added.) Finally, another document indicating the same was pointed out to Freeman during the arbitration hearing itself:

> Q: If you turn to the last page of it, page eight, it's—there's a statement at the end: 'The L[imited] P[artner] representatives.' "You're the first one, that's you?"
> A: That's me.

exclusive permissible grounds for the arbitrators' imposition of personal liability on Freeman. In fact, Freeman's counsel conceded in the hearing before the district court that the Award might also be justified on a "piercing the corporate veil" theory:

> So the point that Mr. Crossman is trying to make in his brief and before your Honor is that perhaps Freeman exercised such control that it would be appropriate to hold him personally liable for the debts of the limited partnership. However, your honor, that does not convert Freeman to a general partner. *What it may be, if one were to look at it in the broadest way, is a request that notwithstanding the fact that it is neither a limited partner nor a general partner, that he is nonetheless personally liable on a piercing the corporate veil issue. And what I'm arguing to your Honor is not whether the arbitrators were correct or not in making a determination that Freeman had liability,* *but specifically in making a declaration that he is a general partner.*

(Emphasis added.) Based on the above,[8] it is clear that the arbitrators' decision to impose personal liability on Freeman, including liability for obligations of the Partnership, was not in manifest disregard of the law.[9] We therefore affirm the judgment of the district court ·to the extent that it confirmed the Award and denied Freeman's petition to vacate it.

## II. Freeman's Indemnification Claims

■ In the district court, Freeman asserted for the first time a counterclaim against Pike for indemnification, and cross-claims for indemnification against all of the other respondents, i.e., all of the various limited partnership and corporate entities, as well as MedApproach, Jeffrey Rush, and Bio–Pharm Investments. The counterclaim seeks indemnification under the Engagement for "any judgment entered in favor of [Pike] and against defendant Freeman, and defendant Freeman is entitled to judgment against Pike in such amount, plus interest."[10] The cross-claims

---

**8.** We also observe in this regard that, at least according to the record, Freeman was not just an advisor or consultant to the general partner, but a "Director/Proxy Holder" of the general partner as well.

**9.** We note that Freeman does not challenge on appeal any liability imposed upon him in the Award other than the amounts related to his liability as a general partner.

**10.** Freeman's counterclaim as originally filed also sought indemnification for "any costs and legal fees incurred by Freeman in connection with the underlying transaction, the arbitration proceedings and in the instant action, together with interest." On appeal, however, with respect to the latter claim for "any costs and legal fees incurred … in connection with the underlying transaction," Pike correctly points out, and Freeman concedes, that in the second amendment to the Agreement, Freeman expressly waived any claim for costs incurred before February 10, 1997. Freeman has also stated on appeal that he does "not seek indemnification against Pike for liabilities which he suffered prior to the issuance of the Award (other than seeking fees and costs in the arbitration itself)"—an apparent abandonment of any attempt to recover transaction-related costs after February 10, 1997. Furthermore, in response to Pike's argument that Freeman cannot be indemnified for bad faith actions or intentional misconduct, Freeman has disclaimed any attempt to be indemnified for the $70,000 the Award imposed for Freeman's bad faith and dilatory conduct. Thus, Freeman currently seeks indemnification from Pike, based on the Engagement, for any amount of the up to $111,075 he would have to provide to Danco Investors, L.P. to enable it to pay Pike's legal fees, the portion of Pike's $776,125 consulting fee which he might be required to pay, the costs of the arbitration proceeding and district court litigation, and any applicable interest on those amounts.

seek indemnification under, *inter alia,* the Agreement "for any judgment entered in favor of [Pike] and against defendant Freeman, and for any costs and legal fees incurred in connection with the underlying transaction, the arbitration proceedings and in the [district court] action, together with interest." [11]

The district court did not discuss the indemnification counterclaim and the cross-claims separately, and appeared to assume that both were asserted primarily under the Agreement.[12] The court first found the claims to be within the scope of the Agreement's arbitration clause and thus subject to arbitration. Finding that Freeman could have asserted his indemnification claims in the arbitration but had failed to do so, the district court then concluded that Freeman had waived his right to assert these claims:

> Freeman had ample opportunity to raise the issue of indemnification during the arbitration. The fact that the precise issue of indemnification was not raised, nor were the calculations regarding indemnification made, did not relieve respondent Freeman of the duty to raise at arbitration all questions or matters relevant to the outcome of the case, including indemnification. *United Food and Comm. Workers, Local 400 v. Marval Poultry Company, Inc.,* 876 F.2d 346, 349 (4th Cir.1989).
>
> .... Arbitration is not a trial run in which a party may sit quietly by without raising pertinent issues, wait to see if the result is in his favor and then seek judicial relief as an afterthought. *See*

*Marino v. Writers Guild of Am., East, Inc.,* 992 F.2d 1480, 1483–84 (9th Cir. 1993). If that were the case, arbitration would lose its vitality as an alternative to litigation, which is inconsistent with the strong federal policy favoring arbitration, the enforcement of arbitration agreements and the confirmation of arbitration awards. *Porush v. Lemire,* 6 F.Supp.2d 178, 182 (E.D.N.Y.1998). To the extent that respondent Freeman would have had any right to be indemnified in this action, any dispute on that issue was required to be arbitrated pursuant to the arbitration agreement contained in the contract. As respondent Freeman did not raise this issue during the arbitration before the panel, he has waived the right to do so.

In light of this waiver finding, the district court dismissed Freeman's indemnification claims with prejudice.

We agree with the district court's determination that the cross-claims are subject to arbitration because, as noted, these claims are predicated in large part on the Agreement, and the Agreement's arbitration clause is sufficiently broad to cover disputes about indemnification claims based on the Agreement.

We do not agree, however, with the district court's determination that the counterclaim is subject to arbitration because that determination is based on the erroneous assumption that the counterclaim was premised on the Agreement. As noted, the counterclaim was actually premised on the Engagement. Whether the counterclaim is subject to arbitration

---

11. Unlike the relief sought from Pike, the cross-claims also seek indemnification for the $70,000 imposed for Freeman's "dilatory and bad faith conduct."

12. Although the district court initially stated that "Freeman seeks indemnification pursuant to, but not limited to," the Agreement—

thus suggesting that Freeman's indemnification claims were also brought pursuant to documents other than the Agreement—the district court immediately went on to state that "Freeman's indemnification claim derives its basis from" the Agreement.

despite the fact that the Engagement lacks an arbitration clause is a question that the district court should address on remand.

Turning to the district court's waiver finding, we note that the cases upon which the district court based this finding do not support the view that one failure to raise an indemnification claim in an arbitration (in which the claims underlying the indemnification claim have been raised) constitutes a waiver of the indemnification claim. None of these cases concerned an *indemnification* claim that a party had failed to raise during such an arbitration. Nor is the general rule recognized by these cases applicable to indemnification claims such as those asserted by Freeman. This rule prohibits "collateral[ ] attack[s]" on an arbitration "procedure on grounds not raised before the arbitrators." *Marino*, 992 F.2d at 1484–85 (holding that party waived challenge to award predicated on allegation that his opponent precluded him from ascertaining the qualifications or partiality of the arbitrators); *see also Marval Poultry*, 876 F.2d at 352–53 ("[A] party to arbitration cannot voluntarily engage in the arbitration of the issues submitted to the arbitrator and then attack the award on grounds not raised before the arbitrator.") (internal quotation marks omitted) (holding that party waived his challenges to the arbitration award); *Porush*, 6 F.Supp.2d at 182 (holding that party waived attack on arbitration award that alleged that award was based on insufficient evidence).[13] It is evident that Freeman's indemnification claims are not "collateral attacks" on the Award. On the contrary, they necessarily presuppose the validity of the Award.

In a vein similar to the district court's waiver finding, Pike argues that Freeman was barred from bringing his indemnification claims in the district court by the doctrine of res judicata or claim preclusion.[14] It is well settled that this doctrine serves to bar certain claims in federal court based on the binding effect of past determinations in arbitral proceedings. *See Goldstein v. Doft*, 236 F.Supp. 730, 732–33 (S.D.N.Y.1964) (Weinfeld, J.), *aff'd*, 353 F.2d 484 (2d Cir.1965) (per curiam); *Am. Ins. Co. v. Messinger*, 43 N.Y.2d 184, 189–90, 401 N.Y.S.2d 36, 371

---

**13.** The additional authorities cited by respondents-appellees are not to the contrary. *See AAOT Foreign Econ. Ass'n (Vo) Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir.1998) (holding that party waived objection to award based on alleged corruption of arbitration panel); *Dorado Beach Hotel Corp. v. Union De Trabajadores De La Industria Gastronomica De Puerto Rico Local 610 of the Hotel Employees and Rest. Employees Int'l Union AFL–CIO*, 959 F.2d 2, 5–6 (1st Cir.1992) (holding that party waived objection to award based on preemption defense); *Ebasco Constructors, Inc. v. Ahtna, Inc.*, 932 P.2d 1312, 1317 (Ak.1997) (holding that party waived objection to award by failing to object in arbitration to arbitrator's consideration of opponent's theory of recovery raised for first time on first day of arbitration hearing).

**14.** This argument raises the question whether federal law or state law should govern a federal court's determination of the preclusive effect of an arbitral award—a question that unfortunately "has not been much developed." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4475, at 772 (Supp.2001). Because there appears to be no significant difference between New York preclusion law and federal preclusion law, however, we need not base our analysis of Pike's res judicata claim on only one of these sources of preclusion law. *See Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir.1997) ("Under both New York law and federal law, the doctrine of res judicata, or claim preclusion, provides that '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' ") (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)).

N.E.2d 798 (1977). To prove that a claim is precluded under this doctrine, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284–85 (2d Cir.2000) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). Whether a claim that was not raised in the previous action could have been raised therein "depends in part on whether the same transaction or connected series of transactions is at issue, and whether the same evidence is needed to support both claims." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir.1997) (internal alterations and quotation marks omitted). "To ascertain whether two actions spring from the same 'transaction' or 'claim,' we look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Id.* (quoting Restatement (Second) of Judgments § 24(b)). As this

"same transaction" test indicates, the "could have been" language of the third requirement is something of a misnomer. The question is not whether the applicable procedural rules *permitted* assertion of the claim in the first proceeding; rather, the question is whether the claim was sufficiently related to the claims that were asserted in the first proceeding that it *should have been* asserted in that proceeding. *See, e.g., Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir.1995) (stating that one of the elements of res judicata is "an issue in the subsequent action which was litigated or which should have been litigated in the prior action"). This said, showing that the applicable procedural rules did not permit assertion of the claim in question in the first action of course also suffices to show that the claim is not barred in the second action.

With respect to the third requirement, the parties agree that Freeman did not assert his indemnification claims in the arbitration. Consequently, the question is whether these claims should have been raised in the arbitration, that is, whether they are based on the same "transaction" as were the claims asserted by Pike in the arbitration.[15] Freeman contends that his

15. This question of course presupposes that the indemnification claims "could have been raised" in the arbitration in the sense that such claims are permitted by the American Arbitration Association's Commercial Dispute Resolution Procedures (the "Procedures"). Nothing in the Procedures indicates that such claims could not have been asserted in the arbitration. The provision most directly on point, R–6, entitled, "Changes of Claim," provides:

> After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission

within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

On the other hand, because Freeman was clearly not required to assert his indemnification claims in the arbitration by R–6, he did not waive them *pursuant to the Procedures* by failing to do so.

Rather than addressing whether the Procedures permitted or required the claims to be brought in the arbitration, the parties debate whether New York law permits or requires indemnification claims to be brought in the same state court proceeding in which the underlying liability claims are asserted. We do not reach this issue because neither the Procedures nor any other authority of which

indemnification claims are not based on the same transaction upon which Pike's breach of contract claims were based because the indemnification claims "ar[ose] out of the entry of the Award against Freeman and the costs and expenses of the arbitration and of the [proceedings before the district court]." We agree. The two sets of claims are related in neither time nor origin: Whereas Pike's breach of contract claims are based on the party's conduct prior to institution of the arbitration, Freeman's indemnification claims did not arise until the Award was granted and the district court proceedings were prosecuted.[16] *Cf. Bank of India v. Trendi Sportswear, Inc.*, 239 F.3d 428, 440 (2d Cir.2000) (rejecting fourth-party defendant's argument that indemnification claim brought against it by fourth-party plaintiff was barred by res judicata because fourth-party plaintiff "could have obtained a conditional judgment against [fourth-party defendant] in [a previous action] if [fourth-party plaintiff] believed it had a valid indemnification claim," on the ground that "we have uncovered no authority requiring a party to obtain a conditional judgment for the purpose of avoiding the preclusive effect of res judicata"). We hold, therefore, that Freeman's indemnification claims are not barred by the doctrine of res judicata.[17]

Finally, we note that there is a third potential justification for the conclusion that Freeman forfeited his indemnification cross-claims (and, assuming that it is subject to arbitration, his indemnification counterclaim) by not asserting them in the arbitration below: because he was required to do so by the Agreement or the Engagement (or some other agreement to which he was a party and which is at issue in this case). If Freeman was not so required, then even assuming that the counterclaim was subject to arbitration, Freeman did not waive his indemnification claims by not asserting them in the arbitration below. Freeman would thus be free to assert them in a future arbitration. Hence, on remand, the district court is instructed to determine whether Freeman was required, pursuant to an agreement to which he was a party and which is at issue in this case, to assert his indemnification

we are aware provides that New York procedural law is applicable in AAA proceedings.

16. In support of his contention that Freeman's indemnification claims are barred by res judicata, Pike quotes the New York Court of Appeals' statement (regarding one of the prime bases of the res judicata doctrine, namely, the minimization of inconsistent results) that "a party is not free to remain silent in an action in which he is a defendant and then bring a second action seeking relief inconsistent with the judgment in the first action." *Henry Modell and Co. v. Minister, Elders and Deacons*, 68 N.Y.2d 456, 461, 510 N.Y.S.2d 63, 502 N.E.2d 978 (1986); *see also Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (stating that res judicata "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions"). It is evident that this "inconsistency" rationale actually supports our finding that Freeman's indemnification

claims are not precluded by res judicata. Far from being inconsistent with the Award, Freeman's indemnification claims necessarily presuppose its validity.

17. Freeman argues that (1) he did not waive his indemnification cross-claims by not bringing them in the arbitration because, under Rule 13(g) of the Federal Rules of Civil Procedure, cross-claims are always permissive, and (2) he did not waive his indemnification counterclaim because, under Rule 13(a) of the Federal Rules of Civil Procedure, only claims which have accrued or matured at the time of the pleading are compulsory and his indemnification counterclaim had not accrued when he filed his pleadings in the arbitration. As the Federal Rules of Civil Procedure do not apply in arbitrations before the American Arbitration Association, however, this reasoning is at most merely analogically relevant to this case. *See Champ v. Siegel Trading Co.*, 55 F.3d 269, 276 (7th Cir.1995).

cross-claims in the arbitration below. Similarly, if the district court determines on remand that the indemnification counterclaim is subject to arbitration, the district court is instructed to determine whether Freeman was required, pursuant to an agreement to which he was a party and which is at issue in this case, to assert his indemnification counterclaim in the arbitration below.

## CONCLUSION

For the reasons discussed, we affirm the judgment of the district court confirming the Award as against Freeman, vacate the judgment insofar as it dismissed with prejudice Freeman's counterclaim and cross-claims for indemnification, and remand for proceedings consistent with this opinion.