**MGM PRODUCTIONS GROUP, INC., Petitioner,**

v.

**AEROFLOT RUSSIAN AIRLINES, Respondent.**

No. 03 Civ. 0500(RMB).

United States District Court, S.D. New York.

May 14, 2003.

Robert C. Juman, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, New York City, Fred G. Bennett, Quinn Emanuel Urguhart Oliver & Hedges LLP, Los Angeles, CA, for Petitioner.

DECISION AND ORDER

BERMAN, District Judge.

I.  Introduction

Petitioner MGM Productions Group, Inc. ("MGM") is the assignee of a November 29, 2002 arbitral award obtained by Russo International Ventures, Inc. ("Russo"), a New York corporation, against Ae-

roflot Russian Airlines ("Aeroflot"), a Russian joint stock company, in an arbitration held in Sweden at the Arbitration Institute of the Stockholm Chamber of Commerce ("Award").[1] MGM asks this Court to confirm the Award, in the amount of $13,155,000.00 plus interest and costs, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 ("Convention"), which was ratified by the United States in 1970 and codified at 9 U.S.C. §§ 201–08. Aeroflot opposes confirmation and argues the Award is a violation of public policy because "enforcement of the award in the United States would reward [Petitioner] for violations of U.S. law." Aeroflot moves for a stay of the proceeding pending the outcome of an appeal of the Award in Sweden. For the reasons set forth below, the Court grants Petitioner's motion to confirm the Award. The Court denies Respondent's motion to stay the proceeding.

## II. Background

In June 1992, Russo contracted with Aeroflot to provide consulting services "for the leasing of any commercial aircraft, (excluding helicopters), commercial aircraft parts, along with related service, support and spare parts contracts to Iran Air" in exchange for commissions ("Agreement"). (Agreement Preamble.) The Agreement provided for arbitration of disputes arising under the Agreement in Stockholm, Sweden under the laws of New York State and Russia. (Agreement ¶¶ 14–15.)

Between January 22, 1993 and August 19, 1996, Russo provided consulting services under the Agreement and Aeroflot made payments totaling $1,822,207.42. (Award at 39, 49.) On October 27, 1998, after a disagreement arose concerning Russo's right to certain commissions, Russo initiated an arbitration. (See id.) "Russo alleged that Aeroflot had breached the Consultation Agreement by withholding commissions due to Russo." (Id.) In response, Aeroflot argued, among other things, that it need not pay any commissions because U.S. executive orders relating to transactions with Iran and U.S. regulations implementing those orders nullified the Agreement. (See id. at 40 ("[T]he Consultation Agreement is null and void since it has been executed in violation of the U.S. embargo on Iranian Transactions....").) For example, Aeroflot argued that U.S. Executive Orders 12,613 ("Prohibiting Imports from Iran"), 12,957 ("Prohibiting Certain Transactions With Respect to the Development of Iranian Petroleum Resources"), and 12,959 ("Prohibiting Certain Transactions With Respect to Iran"), and several regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury implementing those Executive Orders, 31 C.F.R. §§ 560.206 ("Prohibited trade-related transactions with Iran; goods, technology, or services"), 560.410 ("Exportation, reexportation, sale or supply of services"), and 560.515 ("30–day delayed effective date for pre-May 7, 1995 trade contracts involving Iran") (collectively "Executive Orders and OFAC Regulations"), prohibit the provision of services by Russo contemplated in the Agreement. (Award at 41.)

On November 29, 2002, the arbitration panel issued a thorough eighty-one page written Award which upheld the Agreement and directed Aeroflot to pay Russo $13,155,000.00 plus interest and costs for Aeroflot's breach of the Agreement. (Award at 80.) "Russo has ... in fact provided services under the Consultation

1. All references to "Russo" are to Russo International Venture, Inc. and Russo International Management, Inc. All references to "Aeroflot" are to Aeroflot Russian Airlines and its predecessors.

Agreement to such an extent that its duties were fulfilled." (Award at 49.) "[T]he tribunal finds that Aeroflot shall reasonably be awarded ... compensation for unpaid commissions." (Award at 70.) "[T]he transactions in which Russo was engaged can not be regarded as related to goods or services originated in Iran or owned or controlled by the Iranian Government" and, consequently, .did not violate the Executive Orders and OFAC Regulations. (Award at 42–43.)

Russo transferred its interest in the Award to MGM, effective January 9, 2003 (Saroudi Decl. Ex. A).[2] MGM filed this action on January 23, 2003.[3] MGM claims that all necessary grounds exist for this Court to confirm the Award. (Pet'r Br. at 4 ("An arbitral award is sufficiently final for confirmation purposes provided that no further recourse may be had to the appeals division of the arbitral tribunal.... [T]he mere fact that recourse may somehow be had in another court of law does not prevent the Award from being 'binding.' " (citations omitted)).) Aeroflot contends that United States public policy, namely the United States's prohibition against certain transactions with Iran, bars confirmation of the Award. (Resp. Br. at 5–6 ("Because the arbitrators'

award seeks to compensate Russo for acts that violate laws forbidding Americans from engaging in transactions relating to Iran, and to impose liability on Aeroflot for not enabling Russo to engage in further illegal acts, the award is contrary to U.S. public policy.")) Aeroflot cites the same Executive Orders and OFAC Regulations cited by the Swedish arbitral panel, as well as Executive Order 13,059 ("Prohibiting Certain Transactions With Respect to Iran"), 31 C.F.R. §§ 560.204 ("Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran"), 560.208 ("Prohibited facilitation by United States persons of transactions by foreign persons"), and 560.701 ("Penalties").[4] Rather than confirm the award, Aeroflot asks the Court to stay this proceeding pending a decision in the Svea Hovr-att (Court of Appeal) in Sweden.

### III. Standard of Review

"The confirmation of an arbitration award is characterized as a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Sarhank Group v. Oracle Corp.*, 01 Civ. 1285, 2002 WL 31268635, at *3 (S.D.N.Y. Oct. 9, 2002). "Accordingly, 'the showing required to avoid summary confir-

---

**2.** Aeroflot argues that MGM does not have standing to bring this proceeding because Craig Saroudi (the sole owner of Russo and MGM), not Russo, assigned Russo's award to MGM on January 9, 2003. (*See* Decl. of Fred. G. Bennett Ex. H.) In response, MGM submitted a new "Assignment of Assets," dated March 21, 2003. The "Assignment of Assets" states that the assignment is "effective as of January 9, 2003," and that Russo assigned to MGM: "One hundred percent of the interest of Russo International Ventures, Inc. in the Award, dated November 29, 2002, in the case of Russo International Ventures, Inc. v. Aeroflot Russian Airlines, case number 091/1998." (Decl. of Craig Saroudi Ex. A.)

**3.** On February 14, 2003, Aeroflot initiated an appeal in the Svea Hovr-att (Court of Appeal)

in Sweden to annul the Award, claiming that "the arbitrators erred by (1) applying the conflict-of-laws standards of the jurisdictions chosen by the parties, rather than their substantive laws as required, (2) failing to consider and address Aeroflot's objection that it owes no money to Russo under applicable law because it did not accept Russo's services in writing, and (3) failing to take into account Article 782 of the Russian Civil Code of 1994." (Resp. Br. at 4.)

**4.** For the remainder of this Order, references to "Executive Orders and OFAC Regulations" include the U.S. executive orders and regulations cited by the Swedish Arbitral panel as well as those Aeroflot raised in this Court.

mance is high.'" *Id.* at *4 (quoting *Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir.1987)); *see also Pike v. Freeman,* 266 F.3d 78, 89 (2d Cir.2001) (noting the "strong federal policy favoring arbitration, the enforcement of arbitration agreements and the confirmation of arbitration awards").

In enforcement proceedings under the Convention, a court may consider only the specific defenses listed in Article V as grounds for refusing to enforce an award.[5] *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 313 (2d Cir. 1998); *Henry v. Murphy,* M–82, 2002 WL 24307, at *3 (S.D.N.Y. Jan. 8, 2002) (citing *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 20 (2d Cir. 1997)); *see also* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."); *Trans Chem. Ltd. and China Nat'l Mach. Import & Export Corp.,* 978 F.Supp. 266, 309 (S.D.Tex.1997) ("[T]he court must confirm the award unless [the party opposing confirmation] alleges and proves one of the reasons for denying enforcement provided in Article V of the Convention.").

Courts construe the public policy limitation in the Convention very narrowly and apply it only where enforcement would violate the forum state's "most basic notions of morality and justice." *Europcar Italia,* 156 F.3d at 313; *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.,* 737 F.2d 150, 152 (2d Cir.1984); *Trans Chem. Ltd.,* 978 F.Supp. at 310 n. 193 (citing *Fotochrome, Inc. v. Copal Co.,* 517

F.2d 512, 516 (2d Cir.1975)); *Geotech Lizenz AG v. Evergreen Sys., Inc.,* 697 F.Supp. 1248, 1254 (E.D.N.Y.1988). "When construing this section, the Court of Appeals for the Second Circuit has noted the 'pro-enforcement bias' of the Convention." *Geotech Lizenz,* 697 F.Supp. at 1254 (citing *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969, 973 (2d Cir.1974)).

IV. Analysis

The Court has reviewed, among other things, the "Notice of Motion to Confirm Arbitral Award and for Entry of Judgment" and "Petitioner's Memorandum of Law in Support of Its Motion to Confirm Arbitral Award and for Entry of Judgment," dated February 13, 2003, as well as the "Declaration of Fred G. Bennett in Support of the Motion to Confirm Arbitral Award and for Entry of Judgment," dated February 11, 2003; "Aeroflot's Memorandum of Law in Opposition to the Petition and Motion of MGM Productions Group, Inc. to Confirm the Arbitral Award and for Entry of Judgment," "Appendix of Authorities," and "Declaration of Carl Micarelli in Opposition to the Petition and to Petitioner's Motion to Confirm the Arbitral Award and for Entry of Judgment," dated March 12, 2003; Petitioner's "Reply Memorandum of Law in Support of Petition and Motion of MGM Productions Group, Inc. to Confirm Arbitral Award and for Entry of Judgment" and "Per Runeland's First Affidavit," dated March 26, 2003, as well as "Declaration of Craig Saroudi," dated March 25, 2003; Aeroflot's surreply letter, dated April 14, 2003; and Petitioner's let-

---

**5.** Article V of the Convention sets forth seven bases to refuse to enforce an arbitral award. In the present action, Aeroflot advances only one of these, i.e., the so-called public policy defense to enforcement. Article V section (2)(b) states in relevant part:

"2. Recognition and enforcement of an arbitral award may ... be refused if the competent authority of the country where recognition and enforcement is sought finds that: ... (b) The recognition or enforcement of the award would be contrary to the public policy of that country." (Convention Art V § (2)(b).)

ter in response to Aeroflot's surreply letter, dated April 17, 2003. The Court heard argument on May 13, 2003.

The Convention, which the United States ratified in 1970, applies to petitions to confirm foreign arbitral awards. (Convention Art. I ("This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought.").) There is no basis not to confirm the Award.

■ The parties dedicate a substantial portion of their submissions to whether the Agreement violates the Executive Orders and the OFAC Regulations. For example, Aeroflot argues that "the arbitrators' award seeks to compensate Russo for acts that violate laws forbidding Americans from engaging in transactions relating to Iran, and to impose liability on Aeroflot for not enabling Russo to engage in further illegal acts." (Resp. Br. at 1, 5–6 (" 'United States persons' such as Russo are forbidden by federal law to participate in or facilitate such Iranian transactions.").) MGM counters that the Executive Orders and OFAC Regulations do not apply here. (*See, e.g.,* Pet'r Br. at 3 ("Russo's services were performed on behalf of ... Aeroflot only and ... Aeroflot—not Russo—negotiated the Iran Air lease and other leases for Russian aircraft."), 15 ("By its express terms, the Agreement required Petitioner to provide consultation services to *Aeroflot.*").)

The Court agrees with the arbitral panel that the Agreement does not violate the Executive Orders and OFAC Regulations. (*See* Award at 41–43 (concluding that the Agreement "can not be regarded as null and void" based on "the U.S. Regulations

on Iranian Transactions" and that "Russo's consulting responsibilities ran only to Aeroflot and not to any entity in Iran.").) Assuming arguendo that the Agreement did violate the Executive Orders and OFAC Regulations, Aeroflot has not convinced the Court that the public policy defense supports its cause.[6] The public policy defense to enforcement of an arbitral award applies only where enforcement would violate the forum state's "most basic notions of morality and justice." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 313 (2d Cir.1998). That is not the case here. The United States Court of Appeals for the Second Circuit has held that a violation of United States foreign policy does not contravene public policy as contemplated in Article V of the Convention. *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969, 974 (2d Cir.1974) ("In equating 'national' policy with United States 'public' policy, the [party seeking to overturn confirmation] quite plainly misses the mark. To read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility. This provision was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.' Rather, a circumscribed public policy doctrine was contemplated by the Convention's framers and every indication is that the United States, in acceding to the Convention, meant to subscribe to this supranational emphasis."); *see Nat'l Oil Corp. v. Sun Oil Co.,* 733 F.Supp. 800, 819 (D.Del.1990) (stating that " 'public policy' and 'foreign policy' are not synonymous"); *see also Belship Navigation, Inc. v. Sealift, Inc.,* 95 Civ. 2748, 1995 WL 447656, at *6 (S.D.N.Y. July 28, 1995) (" 'Public poli-

---

**6.** The party asserting that one of the exceptions applies has the burden of establishing it. *See Europcar Italia, S.p.A. v. Maiellano Tours,*

*Inc.,* 156 F.3d 310, 313 (2d Cir.1998); *Henry v. Murphy,* M–82, 2002 WL 24307, at *3 (S.D.N.Y. Jan. 8, 2002).

cy' and 'national policy' are not synonymous."); *Antco Shipping Co. v. Sidermar, S.p.A.,* 417 F.Supp. 207, 215–16 (S.D.N.Y. 1976) (declining to equate national policy with public policy).

Public policy arguments, such as those presented here, should be accepted with caution, so as not to discourage enforcement of United States arbitration awards by courts of other countries. *Sarhank Group v. Oracle Corp.,* 01 Civ. 1285, 2002 WL 31268635, at *6 n. 6 (S.D.N.Y. Oct. 9, 2002) ("[C]onsiderations of reciprocity expressly recognized in the Convention counsel courts to invoke the public policy defense with caution lest foreign courts frequently accept it as a defense to enforcement of arbitral awards rendered in the United States."); *Coutinho Caro & Co. v. Marcus Trading, Inc.,* Nos. 3:95CV2362, 3:96CV2218, 3:96CV2219, 2000 WL 435566, at *12 (D.Conn. Mar. 14, 2000) (same). Here, Aeroflot unconvincingly alleges that the Agreement violates the United States's foreign policy respecting Iran. It has not persuaded the Court that the Agreement violates our country's "most basic notions of morality and justice." *Europcar Italia,* 156 F.3d at 313; *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.,* 737 F.2d 150, 152 (2d Cir.1984). Consequently, the Court confirms the Award.

■ Aeroflot also argues that this Court should stay this proceeding under Article VI of the Convention and await the appellate decision from the Svea Hovr-att (Court of Appeal) in Sweden. (*See* Convention Art. VI (permitting a court to "adjourn the decision on the enforcement of the award" where "an application for the setting aside or suspension of the award has been made to a competent authority").) Aeroflot contends that the Court " 'may be acting improvidently by enforcing the award prior to the completion of the foreign proceedings.' " (Resp. Br. at 23 (quoting *Europcar Italia,* 156 F.3d at 317).)

Aeroflot has not persuaded the Court that a stay is appropriate. "[A] district court should not automatically stay enforcement proceedings on the ground that parallel proceedings are pending in the originating country." *Nedagro B.V. v. Zao Konversbank,* 02 Civ. 3946, 2003 WL 151997, at *6 (S.D.N.Y. Jan. 21, 2003); *see also Europcar Italia,* 156 F.3d at 313. In *Europcar Italia,* the Court of Appeals for the Second Circuit stated that "[a] stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration" and set forth a list of factors a court should consider on a motion to stay. *Id.* at 317–18.[7]

7. A court considers:

(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;
(2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
(3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
(4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set

the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
(5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive 'suitable security' and that, under Article V of the Convention, an award should not be enforced if it is set

Aeroflot has not demonstrated that these factors weigh in favor of granting a stay. Quite the contrary. Confirmation, not a stay, advances the general objective of "expeditious resolution of disputes." *Id.* at 317; *see also Sarhank Group v. Oracle Corp.*, 01 Civ. 1285, 2002 WL 31268635, at *3 (S.D.N.Y. Oct. 9, 2002) ("The adjournment of enforcement proceedings impedes the goals of arbitration, i.e., the expeditious resolution of disputes."). Aeroflot's Swedish appeal seeks a broad review of the interpretation of the Agreement—issues the arbitration panel presumably already considered—and promises to delay the finality of the arbitration, which Russo commenced in 1998, even further. (*See* Per Runeland's First Aff. ¶ 8, at 3.) In addition, the Swedish appeal has only just begun. As Aeroflot points out, "Russo and MGM have yet to file responses [to Aeroflot's appellate petition]." (Resp. Br. at 4.) Aeroflot alleges—with an unexplained cite to the *Europcar Italia* opinion—that "the foreign proceedings can be expected to proceed expeditiously." (Resp. Br. at 24.)

Also, the Swedish appeal was not brought to confirm the Award. Aeroflot brought the appeal to set aside the Award, and did so only after MGM petitioned this Court to confirm. *Sarhank Group*, 2002 WL 31268635, at *3 ("The fact that the pending foreign appeal seeks to set aside, not enforce, the award weighs in favor of enforcement in spite of the parallel proceedings ongoing in the originating country.").

The Court also believes that the balance of the hardships of a stay is greater on MGM, assignee of Russo, the party that provided services without receiving pay-

ment, than upon Aeroflot, the party that received services without paying for them. *See Europcar Italia*, 156 F.3d at 318; (*see also* Decl. of Craig Saroudi ¶ 2, at 1 ("MGM . . . ha[s] been deprived of millions of dollars owed under the Consultation Agreement for years. As a result . . . [MGM] is hampered in its financial ability to carry on meaningful business operation.").)

At oral argument, counsel for MGM delivered to the Court a copy of the May 9, 2003 decision of the Svea Hovr-att (Court of Appeal) in Stockholm, Sweden that denied Aeroflot's request to stay enforcement of the Award in Sweden pending the outcome of the appeal. (*See* Pet'r Letter to the Court attaching May 9, 2003 decision of the Svea Hovr-att (Court of Appeal) in Sweden, dated May 13, 2003, attachment at 2 ("The Court of Appeal rejects Aeroflot's application for a stay of execution.").) On May 14, 2003, counsel for Aeroflot informed the Court that Aeroflot "has no further comments on the . . . decision of the Svea Court of Appeal." (Resp. Letter to the Court, dated May 14, 2003.) The May 9, 2003 determination by the Svea Hovr-att only strengthens this Court's conclusion that a stay is unwarranted here.

## V. Conclusion

For the reasons stated, the Court confirms the Award and denies Respondent's motion to stay the proceeding. The Court respectfully requests that the Clerk close this case.

aside or suspended in the originating country; and

(6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

. . .

[T]he first and second factors on the list should weigh more heavily in the district court's decision.

*Europcar Italia*, 156 F.3d at 317–18 (citation omitted).