Jack J. **GRYNBERG**, et al., Plaintiffs,

v.

**BP P.L.C. d/b/a BP Corp. North America et al., Defendants.**

**Civil Action No. H–11–1731.**

United States District Court, S.D. Texas, Houston Division.

March 27, 2012.

Andy Taylor, Attorney at Law, Brenham, TX, Daniel L. Abrams, Law Office of Daniel L. Abrams, PLLC, New York, NY, Roger Allan Jatko, RSM Production Cor-

poration, Samuel Z. Yahn, Pricaspian Development Corp., Denver, CO, Stephen A. Fogdall, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, Kip Kevin Lamb, Attorney at Law, Beaumont, TX, for Plaintiffs.

Paul L. Mitchell, Dena Hanovice Palermo, Andrews Kurth LLP, Phillip B. Dye, Jr., Vinson & Elkins, Houston, TX, John L. Hardiman, Sullivan & Cromwell LLP, Kenneth M. Bialo, Mordecai Geisler, Emmet, Marvin & Martin, LLP, New York, NY, for Defendants.

## ORDER

### DAVID HITTNER, District Judge.

Pending before the Court are the Motion to Dismiss the Fourth Amended Complaint for Lack of Personal Jurisdiction and for Insufficiency of Service of Process, or in the Alternative, to Quash Service filed by Peter Sutherland and Lord John Browne, The BP Defendants' Motion to Dismiss the Fourth Amended Complaint, and the Motion to Dismiss of Statoil, ASA. Having considered the motions, submissions, and applicable law, the Court determines that all of the motions should be granted.

## I. BACKGROUND

This case arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.* On May 6, 2011, Plaintiffs Jack J. Grynberg, Grynberg Production Corporation (a Texas corporation), Grynberg Production Cor-

poration (a Colorado corporation), and Pricaspian Development Corporation (collectively, "Grynberg") filed the pending lawsuit against Defendants BP P.L.C. d/b/a BP Corp North America, BP American Inc., and BP Exploration Operating Company (collectively, "BP"); Dens Norske Stats Oljeselskap ASA a/k/a Statoil ASA ("Statoil"); as well as two individual defendants, Peter Sutherland and Lord John Browne (collectively, the "Individual Defendants"). Since the inception of this lawsuit, Grynberg has filed five amended complaints. In the most recent complaint, the Fifth Amended Complaint (the "Complaint"), Grynberg asserts several civil RICO violations.[1] Specifically, Grynberg alleges BP and the Individual Defendants violated 18 U.S.C. § 1962(b), (c), and (d): Count One contends that the Defendants had interests in or control of an illegal enterprise, a violation of subsection (b); Count Two contends that the Defendants were guilty of an association-in-fact enterprise, a violation of subsection (c); and Count Three contends that the Defendants were part of a conspiracy to commit RICO offenses, a violation of subsection (d). These claims arise from long-running disputes between Grynberg, BP, and Statoil, which are explained below.

### A. The Ongoing Disputes

#### 1. A Consortium for Exploration and Production in Kazakhstan

Grynberg claims that in late 1989 and 1990, Mr. Grynberg "spent substantial

---

**1.** Two of the pending motions, the Individual Defendants' motion to dismiss and BP's motion to dismiss, were both filed as challenges to the Fourth Amended Complaint. Subsequently, this Court granted Grynberg's opposed motion for leave to amend and adopted the Fifth Amended Complaint as the live pleading. Both BP and the Individual Defendants were given the option to either (a) amend their respective motions to dismiss or (b) apply the motions to the newly filed Fifth

Amended Complaint. On November 23, 2011, BP and the Individual Defendants filed a joint letter to the Court declining the opportunity to amend their motions and instead requested "that the Court deem [those] motions to have been directed to the Fifth Amended Complaint." *Notice re: Further Briefing* at 1. As a result, the Court will now construe these motions as having been filed pursuant to the Fifth Amended Complaint.

time, money and effort developing original proprietary, geophysical, technical, economic, political highly confidential and exclusive information" regarding natural resources in Kazakhstan.[2] Specifically, the Complaint states that 'Mr. Grynberg met with and hosted Nursultan Abishevich Nazarbaev, then-First Secretary of the Communist Party (later President) of Kazakhstan. According to Grynberg, this meeting developed into a professional relationship that led to a request by the Kazakh government that Mr. Grynberg organize "an international oil and natural gas consortium to explore, develop and produce oil, natural gas and elemental sulfur in Kazakhstan."[3] Therefore, "at the behest of the Kazakh government, [Mr.] Grynberg met in 1990 and 1991, with various Western oil companies, and their designated subsidiary corporations, as candidates to participate in a consortium to develop and produce oil, natural gas and elemental sulfur reserves in Kazakhstan."[4] One of these oil companies was BP.[5] After further conversations and meetings, Grynberg contends that Mr. Grynberg signed a protocol (the "Protocol") with a Kazakh official, which was, in effect, a letter of intent to form a consortium for exploration and production of natural resources in the Pricaspian Basin portion of Kazakhstan. The Complaint states that four days later, BP officially agreed to join the consortium and accepted Grynberg's proposal to establish a joint venture (the "Joint Venture").

## 2. The Joint Venture

According to the Complaint, the agreed-upon Joint Venture, which was memorialized in a letter executed by both Grynberg and BP on June 7, 1990 (the "June 7 Letter Agreement"), defined an Area of Mutual Interest ("AMI") and "contemplated that Grynberg would assist BP's entry, along with Grynberg, into a consortium of companies that would secure a concession from the government of Kazakhstan to explore, develop and produce hydrocarbons in the AMI."[6] In addition, the Complaint contends that based solely on the Joint Venture, Grynberg (1) supplied BP with proprietary and confidential information—both economic and geophysical—regarding the Kazakhstan oil fields, (2) coordinated several introductions between BP and top Kazakhstan government officials, and (3) provided BP with the Protocol concerning natural resources in the Pricaspian Basin.

Grynberg contends that soon thereafter, BP breached the Joint Venture by violating the terms of the June 7 Letter Agreement, as well as misappropriating Grynberg's proprietary and confidential information by sharing it with Statoil and an American oil field supply salesman, James Giffen ("Giffen"). Grynberg claims that BP's breach of the Joint Venture led to the eventual creation of a third-party consortium created by Giffen (the "Giffen Consortium") at the exclusion of Grynberg.[7] The Giffen Consortium ultimately obtained Kazakh government approval to

---

**2.** *Fifth Amended Complaint* at 10, ¶ 30.

**3.** *Id.* at 13, ¶ 36.

**4.** *Id.* at 14, ¶ 37.

**5.** Generally, the Complaint does not distinguish between the acts of BP, P.L.C., BP America, Inc., or BPX. On one occasion, however, the Complaint states that "BP

through its exploration and production subsidiary BPX met with Grynberg to discuss opportunities in Kazakhstan." *Id.*

**6.** *Id.* at 16, ¶ 42.

**7.** Grynberg claims that BP and Statoil entered into a sub-joint venture, which was then allocated a 1/7th interest in the Giffen Consortium. *Id.* at 19, ¶¶ 52–53.

explore and develop the Greater Kasha-gan Oil Field in Kazakhstan ("GKOF").

### 3. Litigation Regarding the Joint Venture

In 1993, litigation between Grynberg, BP, and Statoil ensued, concerning the Grynberg–BP Joint Venture and BP's and Grynberg's rights under the June 7 Letter Agreement. Grynberg sought a share of the net profits BP received from the Giffen Consortium due to any development and production of oil, natural gas, or elemental sulfur in areas located in the AMI, which included the GKOF. In 1999, after six years, the litigation was resolved in settlement, whereby BP, Statoil, and Grynberg agreed that Grynberg would receive a percentage of all proceeds obtained by BP and Statoil from the GKOF.[8] Grynberg entered into two formal settlement agreements: one with BP and one with Statoil (collectively, the "1999 Settlement Agreements").[9] The two agreements are, in all material respects, identical. By executing the 1999 Settlement Agreements, BP and Statoil agreed to pay Grynberg a specific percentage of net profits obtained from the GKOF. In return, Grynberg agreed to release any claims that it may have regarding the GKOF.[10] Moreover, both of the 1999 Settlement Agreements contained a mandatory arbitration clause, which required that any claims arising out of the rights and obligations of the parties under the 1999 Settlement Agreements would be submitted to arbitration.

### 4. The Sale of BP's and Statoil's Interests in the GKOF

In 2001, BP and Statoil simultaneously announced that they would sell their respective interests in the GKOF to a fellow member of the Giffen Consortium, Total S.A. ("Total"). The sales were finalized in 2002. Grynberg argues that the sale prices of BP's and Statoil's interests were unconscionably low, and that the interests were sold at a discount to avoid payment of proceeds to Grynberg under the 1999 Settlement Agreement and to avoid certain tax implications. Grynberg claims that several side deals were made to conceal the true sales price of the GKOF. In 2002, based on these beliefs, Grynberg initiated an arbitration under the terms of the 1999 Settlement Agreement, in which it sought to recover a more substantial share of the sale prices of BP's and Statoil's interests in the GKOF (the "Arbitration"). The Arbitration lasted for almost eight years, during which time Grynberg contends that several other significant issues came to light.

### 5. Giffen's Indictment and Criminal Prosecution

During the pendency of the Arbitration, Giffen was arrested and indicted for several federal crimes, including violations of the Foreign Corrupt Practices Act (the "FCPA"). The indictment charged Giffen with violating the FCPA by paying bribes to Kazakh government officials. Grynberg avers that these bribes were allegedly documented as "signature bonuses" paid to

8. According to the Complaint, a preliminary settlement agreement was executed in August 1996, however, it took another three years before a final settlement was reached. *Id.* at 21, ¶¶ 60–61.

9. By this time, the BP—Statoil sub-joint venture had dissolved and BP had assigned 1/3rd of the original 1/7th interest in the Giffen

Consortium to Statoil. BP retained a 9.52% direct interest in the Giffen Consortium and Statoil owned a 4.76% interest. *Id.* at 21, ¶ 61.

10. According to Grynberg, the 1999 Settlement Agreements did not include a release for any claims that arose from other areas of the AMI. *Id.* at 22, ¶ 64.

the Kazakh officials. Grynberg contends that in return for the bribes, Giffen obtained the Kazakhstan government's concessions to develop and produce several oil and natural gas reserves in Kazakhstan, including the GKOF. According to Grynberg, Giffen never denied arranging bribes of Kazakh officials so that western oil companies could obtain these concessions. Rather, throughout his prosecution, Giffen asserted the public authority defense, arguing that he acted at the behest of the U.S. Government.[11] Grynberg states that based on this defense, prosecutors were persuaded to drop all charges under the FCPA, and instead, Giffen plead guilty to a misdemeanor offense under the Internal Revenue Code for failure to disclose control over a foreign bank account on his tax returns.[12]

### 6. BP's and Statoil's Internal Audit Reports

Meanwhile in 2007, as part of the ongoing Arbitration, BP produced several internal audit reports to Grynberg that identified several "signature bonuses" paid to the Kazakh government. Included in these signature bonuses were payments constituting "production sharing fees." Grynberg argues that these fees could not have been true production sharing fees because, to date, no production has occurred in the GKOF. Instead, Grynberg

contends that these fees represent "BP's share of an illegal bribe paid to top Kazakh government officials in exchange for a 1/7th share of the GKOF concession."[13] Grynberg further asserts that BP and Statoil, combined, paid approximately $40 million, which Grynberg claims acted as BP and Statoil's portion of the illegal bribes Giffen paid to Kazakh government officials in return for the concession to explore and operate in the GKOF.[14] As such, Grynberg argued in the Arbitration that these amounts should not have been deducted as valid expenses in the calculation of its share in the proceeds of BP's and Statoil's sale of their interests in the GKOF.[15] In addition, in 2008, Grynberg filed suit against BP and Statoil in the United States District Court for the District of Columbia, alleging federal civil RICO claims against both BP and Statoil for their participation in the Giffen Consortium and Giffen's alleged illegal bribery scheme (the "D.C. RICO").[16]

### 7. D.C. RICO Litigation and the Outcome of the Arbitration

The causes of action asserted in the D.C. RICO litigation are almost identical to those filed here. Defendants in that case, BP, P.L.C., and Statoil, moved to compel arbitration of the claims based on the 1999 Settlement Agreement.[17] The D.C. Court

---

**11.** The Complaint states that Giffen's public authority defense was premised on his claim that U.S. intelligence agencies "knew and approved of the bribes because Giffen was a useful and highly placed asset for them in Kazakhstan." *Id.* at 34, ¶ 102.

**12.** *Id.* at 34–35, ¶¶ 102–05.

**13.** *Id.* at 29, ¶ 85.

**14.** *Id.*

**15.** Under the 1999 Settlement Agreements, Grynberg was entitled to a portion of BP's and Statoil's sales proceeds from their respective ownership in the GKOF. The amount BP

and Statoil owed Grynberg took into account the deduction of valid expenses. Grynberg claims that BP and Statoil "attempted to conceal the[ ] illegal payments as purportedly legitimate 'production sharing fees' in their accounting records, and charged the Grynberg Plaintiffs with a portion of these purported 'costs.'" *Id.* at 6, ¶ 14.

**16.** *Grynberg v. BP P.L.C.,* 585 F.Supp.2d 50 (D.D.C.2008).

**17.** Browne and Sutherland were also defendants in the D.C. RICO litigation. *Id.*

agreed that the claims fell within the purview of the 1999 Settlement Agreement's mandatory arbitration provision and, therefore, dismissed the case and compelled arbitration. *See Grynberg v. BP P.L.C.*, 585 F.Supp.2d 50 (D.D.C.2008) (dismissing the Complaint without prejudice and compelling arbitration). Grynberg then proceeded to arbitrate these RICO claims, as well as additional civil RICO claims as part of the ongoing Arbitration.

On February 9, 2010, after almost eight years, a Final Decision and Award was reached in the Arbitration (the "Arbitration Award").[18] First, the arbitrator determined that the payments, regardless of their legality, were properly deducted from the calculation of BP's net proceeds of the sale of its interest in the GKOF, thereby reducing the amount owed to Grynberg under the 1999 Settlement Agreement.[19] In addition, the arbitrator found that, in relation to the D.C. RICO claims, Mr. Grynberg had engaged in bad faith conduct, and as a result, the arbitrator sanctioned Mr. Grynberg personally.

Most significant to the case at hand, the Arbitration Award specifically discussed the D.C. RICO claims. The parties, however, disagree on what the arbitrator eventually decided regarding those claims. Grynberg contends that the arbitrator determined that he did not have authority to decide the legality of the alleged bribes and, as a result, the arbitrator refused to consider the RICO claims. BP concedes that the arbitrator refused to decide the legality of the payments; however, BP contends that the arbitrator nonetheless did determine that it had authority to hear the civil RICO claims and, after consideration, dismissed the RICO claims on their merits.

### 8. Subsequent Appeals, Affirmation, and Remand

BP and Statoil moved to confirm the Arbitration Award before the Supreme Court of the State of New York, and Grynberg filed a cross motion to vacate several portions of the Arbitration Award. On December 8, 2010, the New York Court confirmed the award in all respects, except it found that the arbitrator did not have authority to personally sanction Mr. Grynberg. Thereafter, Grynberg appealed the award of the New York Supreme Court, and recently, on February 21, 2012, the New York Appellate Division, First Department issued an opinion and order regarding the arbitration. The Appellate Division considered whether the Supreme Court's affirmation of two portions of the award—specifically Award 2 and Award 4 of the Arbitration Award—were proper and whether the reversal of the sanctions on Mr. Grynberg were merited. In determining whether Award 4 was properly affirmed, the Appellate Division had to decide whether the legality of the "production sharing fees" was material and should have been considered by the arbitrator in calculating BP's sales proceeds of its interest in the GKOF. The Appellate Division found that the legality of these "production sharing fees" was material and that it was improper for the arbitrator to not consider whether the fees were illegal bribes. The Appellate Division remanded "for the arbitrator to determine the nature of the payment."[20]

---

18. *The BP Defendants' Motion to Dismiss the Fourth Amended Complaint*, Exhibit 2 (*Final Decision and Award* ).

19. *Id.*, Exhibit 1 at 18, ¶ 4 (*Settlement Agreement A* ). Grynberg subsequently sought to vacate this part of the award.

20. *Notice Letter to Judge Hittner*, Exhibit A at 12.

*Grynberg v. BP Exploration Operating Co. Ltd.*, 92 A.D.3d 547, 938 N.Y.S.2d 439 (N.Y.App.Div.2012). The court further explained, "Contrary to the arbitrator's finding, deducting a payment intended to be a bribe to a public official is unenforceable as violative of public policy." *Id.* The Appellate Division did not specifically consider any of the civil RICO claims, and therefore, the opinion did not discuss what, if any, ramifications the arbitrator's refusal to decide the legality of the payments had on the RICO claims.

### B. The Pending Lawsuit

On May 6, 2011, after the New York Supreme Court's affirmation of the Arbitration Award, but before the Appellate Division issued its opinion and order, Grynberg filed the pending lawsuit, alleging civil RICO violations similar to those asserted in the D.C. RICO litigation, which were dismissed by the D.C. Court without prejudice and submitted to arbitration. Grynberg contends that the arbitrator decided that he did not have authority to hear the civil RICO claims, and therefore, the proper forum for adjudication of these claims is the federal district court. All of the defendants oppose this lawsuit and have filed motions to dismiss.

The Individual Defendants, Browne and Sutherland, move to dismiss this lawsuit based on a lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Statoil also moves to dismiss this lawsuit based on a lack of personal jurisdiction and, in addition, claims that it is entitled to sovereign immunity from suit, therefore divesting this Court of subject matter jurisdiction. In the alternative, both the Individual Defendants and Statoil join in BP's motion to dismiss the case for failure to state a claim on which relief may be granted. BP contends that several affirmative defenses bar this Court from adjudicating the case. First, BP claims that the claims asserted are barred by *res judicata*. BP contends that the claims alleged in this lawsuit were adjudicated in the Arbitration and may not be relitigated. Second, BP argues that even if the claims are not precluded by *res judicata* the Complaint should be dismissed because all causes of action are barred by the parties' mutual release of the claims in the 1999 Settlement Agreements. Third, BP contends that Grynberg's civil RICO claims fail because (a) the Court does not have subject matter jurisdiction, (b) Grynberg has failed to establish RICO standing, and (c) the Complaint fails to plead the essential elements of a RICO violation. Fourth, BP argues that the RICO claims are time barred.

Grynberg contends that this Court has personal jurisdiction over the Individual Defendants and Statoil pursuant to Federal Rule of Civil Procedure 4(k)(2) and that Statoil is not immune from suit under the Federal Sovereign Immunities Act ("FSIA"). Further, Grynberg refutes all of the arguments set forth by BP—and adopted by the Individual Defendants and Statoil—in BP's motion to dismiss. Instead, Grynberg contends that each of the civil RICO causes of action are valid and have been properly plead. In addition to the written motions, the Individual Defendants, BP, and Grynberg each had an opportunity to present their positions to the Court orally at a hearing held in open court.[21] Therefore, the Court will consider each of the defendant's motions and Grynberg's respective responses.

---

**21.** At the time of the hearing, Statoil had not yet been properly served and was not present. Nonetheless, the arguments asserted by Statoil are similar to those argued by both the Individual Defendants and BP at the hearing. Moreover, Statoil's motion to dismiss thoroughly sets forth its argument without need for oral argument.

## II. STANDARD OF REVIEW

Although each of the three pending motions are motions to dismiss, they are not all subject to the same standard of review. The Individual Defendants filed their motion to dismiss pursuant to Rule 12(b)(2).[22] BP relies on Rules 9, 12(b)(1), and 12(b)(6) in its motion to dismiss. Statoil filed its motion to dismiss pursuant to a combination of those rules—Rules 9, 12(b)(1), 12(b)(2), and 12(b)(6). This Court determines that based on the arguments made by each movant, the standards discussed below are the relevant procedural standards.

### A. Rule 12(b)(1)—Motion to Dismiss for Lack of Subject Matter Jurisdiction

 Federal Rule of Civil Procedure 12(b)(1) requires that a court dismiss a claim if the court does not have subject matter jurisdiction over the dispute. FED. R.CIV.P. 12(b)(1). A motion for lack of subject matter jurisdiction under Rule 12(b)(1) must be considered before any motion on the merits because subject matter jurisdiction is required to determine the validity of any claim. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir.1994). "Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cty., Tx.*, 798 F.2d 736, 741 (5th Cir.1986). Unlike a court considering a Rule 12(b)(6) or Rule 56 motion, district courts have a "unique power ... to make factual findings which are decisive of [subject matter] jurisdiction" when considering a motion under Rule 12(b)(1) that raises questions of fact relevant to subject matter jurisdiction. *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir.1981).

### B. Rule 12(b)(2)—Motion to Dismiss for Lack of Personal Jurisdiction

 Federal Rule of Civil Procedure 12(b)(2) requires that a court dismiss a claim if the court does not have personal jurisdiction over the defendant. FED. R.CIV.P. 12(b)(2). "When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the district court's jurisdiction over the defendant." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 592 (5th Cir.1999). If the parties dispute essential facts relevant to personal jurisdiction, an evidentiary hearing may be necessary; however, where facts are not in dispute a court may rule on the issue without conducting an evidentiary hearing, in which case, the plaintiff must present a *prima facie* case of jurisdiction. *See Felch v. Transportes Lar–Mex SA DE CV*, 92 F.3d 320, 326 (5th Cir.1996). When an evidentiary hearing is not held, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir.1994).

---

**22.** The Individual Defendants' motion was also originally filed pursuant to Federal Rule of Civil Procedure 12(b)(5) based on insufficiency of service. However, since the filing of their motion, the Individual Defendants have accepted service of process and thereby waive any Rule 12(b)(5) motion. *See Plaintiffs' Response to Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Insufficiency of Service of Process or, in the Alternative, to Quash Service*, Exhibit 1 at 1(*Letter from Paul Mitchell to Leigh Parker*, Attachment No. 1 at 2) (accepting service of process).

*C. Rule 12(b)(6) and Rule 12(d)—Motion to Dismiss for Failure to State a Claim and Conversion to Summary Judgment*

██ Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." FED.R.CIV.P. 12(b)(6). As a general rule, when considering motions to dismiss made pursuant to Rule 12(b)(6), a Court may not consider matters outside of the pleadings. *Hall v. Hodgkins*, 305 Fed. Appx. 224, 227–29 (5th Cir.2008). Instead, the Court must look only to the pleadings and must "accept[ ] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir.2004)) (internal quotation marks omitted). Generally, any documents that are referenced in the pleadings themselves may be considered. *See* FED.R.CIV.P. 10(c) (adopting documents attached to a pleading as part of the pleading for all purposes). If, however, matters outside of the pleadings are presented to the Court in a motion to dismiss, and the Court considers the extrinsic matters, the motion must be treated as a motion for summary judgment. FED. R.CIV.P. 12(d).[23]

██ Rule 12(d) requires that the parties "be given a reasonable opportunity to present all the material that is pertinent to the motion." FED.R.CIV.P. 12(d). While parties should be on notice that matters outside the pleadings are being considered by the Court, a district court need not give "express notice" that it will treat the motion to dismiss as one for summary judgment. *Mackey v. Owens*, No. 98–60758, 1999 WL 423077, at *2 (5th Cir. June 2, 1999); *Montgomery v. Sears Roebuck & Co.*, Civil Action No. 09–0584, 2010 WL 4781438, at *3–4 (W.D.La. Oct. 14, 2010). Instead, "the proper question is whether the nonmovant was on notice that the district court *could* treat the motion as one for summary judgment, not [whether] the court *would* in fact do so." *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed.Appx. 775, 784 (5th Cir. 2007) (quoting *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1284 (5th Cir.1990) (internal quotation marks omitted)). Typically, a nonmovant is considered to have notice when the nonmovant is aware that additional materials have been attached to the motion to dismiss, they have had time to respond to the motion, and they are aware that the court may rule on the motion using the additional materials. *See Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 195–96 (5th Cir.1988) (concluding that plaintiffs had adequate notice); *Clark*, 798 F.2d at 746 (holding that sufficient notice had been given to the nonmovant when the court held a hearing, at which the court accepted evidence outside the pleadings, and there was ample time after the hearing for the parties to submit additional evidence to the court).[24]

---

**23.** Rule 12(d) states:

**Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

**24.** Presumably, the standard for required "notice" in both *Clark* and *Isquith* was more stringent than it would be under the current Federal Rules of Civil Procedure. At the time each of these cases was decided, Rule 56 required that a court give ten days' notice before entry of summary judgment. *Isquith*, 847 F.2d at 195; *Clark*, 798 F.2d at 745–46. The former language of Rule 56(c) and the timing provisions contained therein were superseded in 2010. FED.R.CIV.P. 56 advisory committee's notes (2010 amendment).

*D. Rule 56—Summary Judgment*

 Summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(a). The court must view the evidence in a light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir.1997). Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the nonmovant will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine issue for trial. *See also* FED.R.CIV.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir.1993) (citation omitted).

 But the nonmoving party's bare allegations, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 713 (5th Cir.1994). If a reasonable jury could not return a verdict for the nonmoving party, then summary judgment is appropriate. *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct.

2505. The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or "only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir.2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)). Furthermore, it is not the function of the court to search the record on the nonmovant's behalf for evidence that raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n. 30 (5th Cir.1992).

### III. LAW & ANALYSIS

*A. Jurisdiction Over Statoil—Foreign Sovereign Immunity*

 "The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state." *Dale v. Colagiovanni*, 443 F.3d 425, 427–28 (5th Cir.2006); 28 U.S.C. §§ 1330, 1602. The FSIA also acts as the sole basis for obtaining personal jurisdiction over a foreign state. *Af–Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 426 (5th Cir.2006) (citing *In re B–727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir.2001)). In other words, the FSIA provides the only means for a court to obtain any jurisdiction over a foreign state. "The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts. However a district court can exercise subject matter jurisdiction over a foreign state if one of the statute's exceptions apply." *Moran*, 27 F.3d at 172 (internal citations omitted) (citing 28 U.S.C. § 1604 (1994)). The party relying on immunity under the FSIA bears the burden of showing a *prima facie* case of immunity under the Act, but once that initial burden has been met, it is the opposing party's burden to show that the immunity is improper because one of the statutory exceptions applies. *Id.*

### 1. Statoil's Prima Facie Case of Immunity

 Under the FSIA, an instrumentality of a foreign state falls within the immunity protections of the foreign state itself and thereby satisfies the initial burden of showing a *prima facie* case of immunity.[25] *See Good v. Aramco Servs. Co.,* 971 F.Supp. 254, 256 (S.D.Tex.1997) (Harmon, J.) (applying this rationale). Statoil has made a *prima facie* case of immunity by illustrating that it is an instrumentality of Norway, a foreign state. Statoil is a distinct legal entity that is incorporated under the laws of Norway, is 67% owned by the Norwegian State, and is domiciled in Norway. Accordingly, Statoil falls within the definition of "agent or instrumentality of a foreign state," and falls within the protections of the FSIA, subject to the exceptions set forth throughout the Act. 28 U.S.C. § 1603(b). Having met this initial burden, Grynberg must now show that one of the FSIA exceptions apply to allow the Court to obtain jurisdiction over Statoil or else the case must be dismissed for lack of subject matter jurisdiction. Grynberg contends that Statoil is not immune from suit under the FSIA because of two exceptions: (1) waiver and (2) the commercial activity exception.

### 2. Waiver and the Commercial Activity Exception

 Section 1605 of the FSIA sets forth general exceptions to jurisdictional immunity of a foreign state. 28 U.S.C. § 1605. One way a foreign state may be subject to jurisdiction is through either explicit or implicit waiver of immunity. 28 U.S.C. § 1605(a)(1). The United States Court of Appeals for the Fifth Circuit has held that an implicit waiver ordinarily occurs when "(1) a foreign state agrees to arbitration in another country; (2) the foreign state agrees that a contract is governed by the laws of a particular country; [or] (3) the state files a responsive pleading without raising the immunity defense." *Af–Cap, Inc.,* 462 F.3d at 426 (quoting *Rodriguez v. Transnave, Inc.,* 8 F.3d 284, 287 (5th Cir.1993)). In addition to waiver, the FSIA also provides for a commercial activity exception, which applies to three separate scenarios: (1) commercial activity that occurs in the United States; (2) an act performed in the United States that is connected with commercial activity that occurs elsewhere; or (3) an act outside the United States related to commercial activity outside the United States, but only when the act causes a direct effect in the United States.[26] Applying any prong of this exception requires a court to deter-

---

**25.** To make a *prima facie* case of immunity, a party must show that they are considered a "foreign state" under the statute. *See* 28 U.S.C. § 1604 ("[A] *foreign state* shall be immune from the jurisdiction of the courts of the United States and of the States."). The statute's definition of "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The statute goes on to define "agency or instrumentality of a foreign state" as being (1) "a separate legal person, corporate or otherwise," (2) . . . "a majority of whose shares or other ownership interest is owned by a foreign state," and (3) "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b).

**26.** The commercial activity exception states:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . .

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. . . .

28 U.S.C. § 1605(a)(2).

mine what the "acts" at issue are and where they were performed. A court must also determine what constitutes the relevant commercial activity and its location.[27]

### 3. Application of the Exceptions

Grynberg contends that both the waiver and the commercial activity exceptions preclude immunity for Statoil. Grynberg argues that Statoil waived immunity by entering into the 1999 Settlement Agreement, which contains a clause consenting to New York law. According to Grynberg, the commercial activity exception also applies because of the ongoing dispute between Grynberg and Statoil. First, Grynberg argues that the original litigation, the 1999 Settlement Agreement, payments made under the 1999 Settlement Agreement, and the ensuing Arbitration all constitute commercial activity that has occurred in the United States, thereby precluding immunity. Second, Grynberg contends that the 1999 Settlement Agreement entered into with Statoil also constitutes an "act" performed in the United States, bringing Statoil within the second commercial activity exception. Finally, Grynberg argues that even if there was no act or commercial activity that took place within the United States, Statoil's bribery scheme had a direct effect in the United States because it "enabled Statoil to underpay Plaintiffs pursuant to a United States contract which explicitly required and led to periodic payments in Denver, Colorado."[28]

As Statoil notes, all of these arguments are premised on the original Grynberg— BP—Statoil litigation in New York, the resulting 1999 Settlement Agreement, and the subsequent Arbitration. None of the other "acts" or "commercial activity" underlying this lawsuit took place in the United States. The alleged bribes took place in Kazakhstan and were allegedly made to influence Kazakh government officials, and the damages sought are based on the sale of an interest in the GKOF, a production field in Kazakhstan. Moreover, the "direct effect" argument that Grynberg makes is premised on the 1999 Settlement Agreement as well: the alleged "direct effect" is the underpayment of proceeds to U.S. citizens pursuant to the 1999 Settlement Agreement. Therefore, for the Court to find that waiver occurred by Statoil or that the commercial activity exception applies, the Court would inherently be forced to rely on the 1999 Settlement Agreement and the ensuing Arbitration to determine that Statoil was not immune from suit in the federal courts. The 1999 Settlement Agreement, however, expressly states that any "dispute or difference arising out of, in relation to or in any way connected with this Agreement or the Mutual Releases (whether contractual, tortious, equitable, statutory or otherwise) ... shall be finally and exclusively referred to and settled by arbitration."[29] Therefore, if Statoil is amenable to suit in the United States, the claims must stem from the 1999 Settlement Agreement and, therefore, must be arbitrated.[30] At the

---

**27.** Commercial Activity is defined as "a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603.

**28.** *Plaintiffs' Brief in Response to Statoil ASA's Motion to Dismiss* at 19–20.

**29.** *Motion to Dismiss of Statoil ASA,* Exhibit B2 at 59, § 10.04 (*Settlement Agreement*).

**30.** *See Grynberg v. BP P.L.C.,* 585 F.Supp.2d 50 (D.D.C.2008) (compelling arbitration of the D.C. RICO claims). Arguably, BP's claims also would be subject to arbitration under identical terms of their 1999 Settlement Agreement. Because the Court dismisses the BP claims on *res judicata* grounds, the

very least, if the claims stem from the 1999 Settlement Agreement and jurisdiction is proper, Statoil has elected to join in the BP's motion to dismiss. As a result, the discussion below dismissing all claims against BP pursuant to the doctrine of *res judicata* would apply equally to causes of action against Statoil.

■ On the other hand, if the claims are separate and do not arise out of or in relation to the 1999 Settlement Agreement, then the waiver within the 1999 Settlement Agreement is not applicable as an exception to the FSIA. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan,* 296 F.3d 1154, 1162–64 (D.C.Cir. 2002) (holding that contractual waivers are narrowly construed and that RICO claims not related to the contract are not considered to fall within the immunity waiver). And if the RICO claims are considered separate and unrelated to the 1999 Settlement Agreements, thereby not falling within the ambit of the arbitration clause, then Grynberg has failed to show that an "act," "commercial activity," or "direct effect" occurred in the United States for purposes of the commercial activity exception to the FSIA. Therefore, if the claims do not arise under the 1999 Settlement Agreement then no exception is applicable, and the FSIA precludes jurisdiction. Under either analysis, this Court must

dismiss Grynberg's claims against Statoil because the Court either (a) lacks jurisdiction under the FSIA; (b) is required to submit the dispute to arbitration pursuant to the terms of the 1999 Settlement Agreement; or (c) consolidates Statoil's motion with BP's motion to dismiss and dismisses the claims based on *res judicata.* Accordingly, Grynberg's claims against Statoil are dismissed.

## B. Personal Jurisdiction Over Individual Defendants, Browne and Sutherland

■ The Individual Defendants have filed a motion to dismiss this case based on lack of personal jurisdiction. Grynberg argues that this Court has jurisdiction over the Individual Defendants based on Federal Rule of Civil Procedure 4(k)(2), which states:

> **Federal Claim Outside State–Court Jurisdiction.** For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

FED.R.CIV.P. 4(k)(2).[31] The Fifth Circuit

---

Court need not analyze whether the claims would also be dismissed in lieu of arbitration.

**31.** Grynberg also argues that the Individual Defendants have waived their objection to personal jurisdiction under Rule 4(k)(2) because they did not specifically address this Rule in their original motion but instead asserted that personal jurisdiction was improper under the Texas long-arm statute. The Court is not persuaded by this argument.

The case cited by Grynberg to support its waiver argument is not on point. In *General Sign Design Co. v. American General Design, Inc.,* the court considered whether an objection to personal jurisdiction was waived when a defendant filed a Rule 12(b)(3) motion to

dismiss for improper venue, but did not include a 12(b)(2) motion for lack of personal jurisdiction. *Gen. Design Sign Co. Inc. v. Am. Gen. Design, Inc.,* No. 3:02–cv–2298–H, 2003 WL 251931, at *1 (N.D.Tex. Jan. 31, 2003). That is not the issue in the case at bar. Here, the Individual Defendants' motion to dismiss specifically objects to personal jurisdiction under Rule 12(b)(2), thereby preserving the objection to personal jurisdiction.

Moreover, once an objection to personal jurisdiction is asserted, the plaintiff has the burden of proving a *prima facie* case of personal jurisdiction over the defendant. *World Tanker Carriers Corp. v. M/V Ya Mawlaya,* 99 F.3d 717, 723 (5th Cir.1996). Grynberg can-

has explained that, for claims arising out of federal law, Rule 4(k)(2) creates personal jurisdiction over a defendant "when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." *World Tanker Carriers Corp. v. M/V Ya Mawlaya,* 99 F.3d 717, 720 (5th Cir.1996). Neither party argues that subpart (A) above cannot be satisfied. The parties dispute, however, whether subpart (B) has been satisfied. Subpart (B) requires that the due process clause of the Fifth Amendment be satisfied to establish personal jurisdiction over a defendant. *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.,* 249 F.3d 413, 420 (5th Cir.2001). Like the due process clause of the Fourteenth Amendment, the Fifth Amendment Due Process clause has two requirements: First, a defendant must have minimum contacts with the United States to establish either specific or general jurisdiction. Second, exercising jurisdiction cannot "offend the traditional notions of fair play and substantial justice." [32] *De Leon v. Shih Wei Navigation Co. Ltd.,* 269 Fed.Appx. 487, 489 (5th Cir.2008); *see also Quick Techs., Inc. v. Sage Grp. PLC,* 313 F.3d 338, 343 (5th Cir.2002) (quoting *World Tanker Carriers Corp.,* 99 F.3d at

723) (applying the "now familiar minimum contacts analysis . . . to determine whether the assertion of personal jurisdiction would offend traditional notions of fair play and substantial justice").

Having minimum contacts with the United States may be satisfied in one of two ways: (1) the cause of action can arise from a specific contact with the United States, creating specific jurisdiction, or (2) if the cause of action arose from an event that did not occur in the United States, a defendant may be subject to general jurisdiction if the defendant has engaged in "systematic and constant" contacts with the United States. *De Leon,* 269 Fed.Appx. at 489; *see also Quick Techs., Inc.,* 313 F.3d at 343 (discussing specific jurisdiction). While Rule 4(k)(2) expands the general jurisdiction inquiry to encompass a defendant's contacts with the United States in general, rather than with a specific state, the plaintiff still bears the burden of making a *prima facie* showing of the defendant's nationwide contacts. *World Tanker Carriers, Corp.,* 99 F.3d at 723.

Neither of the Individual Defendants is a citizen of the United States. The civil RICO claims asserted by Grynberg do not arise from an action that took place in the United States. The bribes were allegedly made to Kazakh government officials and

not try to dispel its burden by arguing that the Individual Defendants wrongly anticipated the basis Grynberg would use to assert personal jurisdiction, especially when the Complaint states a general assertion of personal jurisdiction without articulating any specific basis. Instead, Grynberg must establish that Rule 4(k)(2) creates personal jurisdiction if it wants to avail itself of that rule in establishing personal jurisdiction over the Individual Defendants. For the foregoing reasons, the Court finds that the Individual Defendants did not waive their personal jurisdiction objection.

**32.** The standard for analyzing minimum contacts under the Fifth Amendment is the same

as the standard used to analyze minimum contacts under the Texas long-arm statute and the Fourteenth Amendment. *See Ruiz v. Martinez,* No. EP–07–cv–078–PRM, 2007 WL 1857185, at *9 (W.D.Tex. May 17, 2007) ("The due process required in federal cases governed by Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment. Rule 4(k)(2) requires the same 'minimum contacts' analysis, but applies it to the nation as a whole rather than merely the forum state." (citing *Submersible Sys., Inc.,* 249 F.3d at 420)).

were related to a concession to produce oil and gas in the GKOF. Grynberg does not contend that there is specific jurisdiction arising from the alleged bribes. Instead, Grynberg argues for general jurisdiction over the Individual Defendants.[33] Therefore, for this Court to obtain personal jurisdiction over the Individual Defendants, Grynberg must be able to allege contacts by each of the Individual Defendants that satisfies the minimum contacts test.

### 1. Whether the United States Has General Jurisdiction Over Browne

 In its response, Grynberg lists twelve bases for establishing personal jurisdiction over Browne, which date as far back as 1969.[34] Two of the "contacts" listed by Grynberg, do not attempt to identify any connection between Browne and the United States, but rather, they describe two instances that Grynberg contends were illegal bribery schemes in which Browne participated, both of which took place outside the United States—payments to the state-owned oil company of Azerbaijan and the "production sharing fees" paid in Kazakhstan that are at issue in this case.[35] Because the Court finds that these two allegations fail to state a connection between Browne and the Unit-

ed States, they will not be considered in the minimum contacts analysis.

 Three of the other alleged "contacts" stem from Browne's roles as Director or Managing Partner of several U.S.-based companies, but Grynberg does not identify any incidents where Browne visited the United States in connection with these roles.[36] A defendant's employer's contacts with the jurisdiction cannot be imputed to the defendant; however, the status of being an employee does not insulate a person from jurisdiction. *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Stuart v. Spademan*, 772 F.2d 1185, 1197 n. 11 (5th Cir.1985).[37] "Each defendant's contacts with the forum State must be assessed individually." *Id.* As a result, even though Browne has served on the Board of Directors of several U.S. companies—including Goldman Sachs, Intel Corporation, Coda Automotive, Inc., and Riverstone Holdings, LLC— the activities of those companies, including their U.S. based offices, cannot be attributed directly to Browne for purposes of personal jurisdiction. Grynberg has failed to show how Browne's involvement with those companies creates a direct connec-

**33.** *Plaintiffs' Response to Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Insufficiency of Service of Process or, in the Alternative, to Quash Service* at 14.

**34.** *See id.* (describing Browne's early employment with BP, in which he worked in several U.S. cities between the years of 1969 and 1983).

**35.** Grynberg states, "Browne resigned from Goldman Sachs and BP in May, 2009 after revelations of perjury before a United Kingdom High Court and possible misuse of corporate funds." *Id.* at 16. Grynberg proceeds to describe an alleged bribery scheme to the state-owned oil company of Azerbaijan. *Id.* at 16–17. Notably, this arises from legal actions

based in the United Kingdom, not the United States.

**36.** Grynberg identifies Browne's role as a Director of Goldman Sachs from 1999 to 2007, *id.* at 16, his role as a Director of two California based companies, Intel Corporation and Coda Automotive, Inc., *id.* at 17, and his role as Managing Director and Managing Partner of Riverstone Holdings LLC, *id.* at 18.

**37.** The Court in *Stuart v. Spademan* went on to say that the exception to this is "when the corporation is the alter ego of the individual." *Stuart*, 772 F.2d at 1197. Grynberg does not contend that BP or any of the companies for which Grynberg acted as a Director were alter egos of Browne.

tion between Browne, individually, and the United States.

The majority of the remaining contacts alleged in the Complaint are based on Browne's employment and fiduciary relationship to BP. For instance, three of the twelve "contacts" identify money expenditures on behalf of BP that were allegedly authorized by Browne and were transacted in the United States. Grynberg does not alleged that Browne himself was located in the United States to make the transactions nor that he individually contacted any U.S. entities in making the payments; instead, each of those expenditures were authorized by Browne on behalf of BP for the benefit of a third-party.[38] These expenditures were made by Browne as an agent and officer of BP, as were several of the trips made by Browne to the United States.[39] Although, it is clear that *specific jurisdiction* could be established based on Browne's direct actions as an employee of BP, *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), it is unclear in the Fifth Circuit whether these contacts can be attributed to Browne individually in asserting *general jurisdiction* under a Rule 4(k)(2) minimum contacts analysis. In analyzing minimum contacts under the Fourteenth Amendment and the Texas long-arm statute, the Fifth Circuit has held that "[j]urisdiction over an individual cannot be predicated upon jurisdiction over a corporation." *Stuart*, 772 F.2d at 1197 n. 11. This concept is known as the fiduciary-shield doctrine and prohibits the attribution of corporate acts to corporate officers in exercising personal jurisdiction under a state long-arm statute. *Gen. Retail Servs., Inc.*, 255 Fed.Appx. at 794. But the Fifth Circuit has yet to apply this standard in conjunction with personal jurisdiction premised on Rule 4(k)(2). Further, the Seventh Circuit, has expressly held that the fiduciary-shield doctrine does not apply when personal jurisdiction rests on Rule 4(k)(2). *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 553 (7th Cir.2001). Therefore, in analyzing whether these contacts will satisfy the minimum contacts requirement, this Court will focus on whether it was foreseeable that Browne could be subject to suit in the United States as an individual based on his actions on behalf of BP. *See Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652 (5th Cir.2004) (concluding that a defendant had continuous and systematic contacts with the United States under Rule 4(k)(2) because it was "foreseeable that suit in U.S. courts would result").

■ One consideration that must be taken into account when determining the foreseeability of suit or determining whether contacts are continuous and systematic is the time frame of the alleged contacts. *See Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir.1999) ("General jurisdiction can be as-

**38.** First, Grynberg contends that Browne authorized payment of medical expenses for the Prime Minister of Kazakhstan who needed medical procedures while on a stopover in Houston. *Plaintiffs' Response to Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Insufficiency of Service of Process or, in the Alternative, to Quash Service* at 15. Second, Grynberg contends that, at Browne's behest, BP made a $500,000.00 payment to Giffen that originated in the United States. *Id.* at 19. Third, Grynberg claims that in 1990, Browne expended money, on behalf of BP, to fly the Kazakh Government from Anchorage to Almaty during their visit to the United States. *Id.* at 20.

**39.** Grynberg claims that Browne accompanied Kazakh officials on a tour of several U.S. cities in 1990 on behalf of BP, that he attended BP meetings in Houston sporadically between 1993 and 1997, and most recently, that he visited Texas City after a fire and explosion that occurred at a BP Refinery in 2005. *Id.* at 14–20.

sessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed."). Other than Browne's involvement as a Director of several U.S. companies, which this Court has already determined are insufficient to establish direct "contacts" between Browne and the United States, the most recent contact Browne has had with the United States is a visit he made to Texas City in 2005, after a fire and explosion at a BP Refinery. All of the other incidents Grynberg points to occurred at least fourteen years before this lawsuit was filed, with a majority of them occurring at least twenty years earlier. While these contacts might have been systematic and continuous at one point in time, the majority of the contacts alleged by Grynberg occurred so long ago that it cannot be foreseeable that Browne would still be subject to general jurisdiction based on these actions.

Based on the foregoing, even if the Court takes all the allegations set forth by Grynberg as true, the Court finds that it was not foreseeable that Browne, as an individual, would now be subject to suit in the United States. Browne's "contacts," as alleged by Grynberg, do not constitute "substantial, continuous, and systematic" contacts. Accordingly, Grynberg has not met its burden of proving a *prima facie* case of jurisdiction over Browne, and therefore the Court must dismiss the claims against Browne for lack of personal jurisdiction.

### 2. Whether the United States Has General Jurisdiction Over Sutherland

 The allegations set forth by Grynberg of Sutherland's contacts with the United States are substantially more concise than those that Grynberg asserted on behalf of Browne. Grynberg merely states that Sutherland "has maintained continuous and systematic contacts with the United States through chairmanship of the boards of BP plc ... and currently with Goldman Sachs, International." [40] This conclusory assertion of jurisdiction is not sufficient to meet the burden of showing minimum contacts. As stated above, a defendant's employer's contacts with the jurisdiction cannot be imputed to the defendant; instead a plaintiff must establish specific contacts subjecting each individual defendant to personal jurisdiction of the forum. *Calder,* 465 U.S. at 789, 104 S.Ct. 1482. Grynberg has not met its burden of establishing contacts sufficient to establish personal jurisdiction over Sutherland, and the Court must dismiss the claims against Sutherland for lack of personal jurisdiction. Accordingly the Individual Defendants' Motion to Dismiss is granted in full.

### C. Addressing the Merits of Grynberg's Claims and BP's Motion to Dismiss

As previously discussed, BP premises its motion to dismiss on four grounds. BP first contends that this case should be dismissed because it is barred by *res judicata.* For the reasons set forth below, this Court agrees and finds it unnecessary to analyze BP's other bases for dismissal.

### 1. Converting the Motion to Dismiss to a Motion for Summary Judgment

BP filed this motion primarily as a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted.[41] Nonetheless, BP attached matters

---

**40.** *Plaintiffs' Response to Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Insufficiency of Service of Process or, in the Alternative, to Quash Service* at 20.

**41.** Additionally, BP's motion contends that it is also filed as a motion to dismiss based on a lack of subject matter jurisdiction—Rule 12(b)(1). The Court, however, fails to find an adequate basis for such motion.

outside the original pleadings: (1) an affidavit; (2) the 1999 Settlement Agreement between BP and Grynberg; (3) the Arbitration Award; and (4) the decision of the New York Supreme Court affirming the Arbitration Award. Therefore, as discussed in Part II.D., *supra,* if the Court considers the attached documents, the motion must be converted to one for summary judgment. FED.R.CIV.P. 12(d).

■ *Res judicata* is an affirmative defense. FED.R.CIV.P. 8(c). Therefore, unless the complaint itself sets forth the facts necessary to determine that res judicata precludes adjudication, summary judgment is the proper standard for determining whether a claim should be dismissed based on *res judicata. See Hall,* 305 Fed.Appx. at 227 ("[G]enerally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense.") (quoting *Test Masters Educ. Servs. v. Singh,* 428 F.3d 559, 570 n. 2 (5th Cir.2005)) (internal quotation marks omitted). In the case at bar, BP's claim of *res judicata* cannot be sustained by looking only to the Complaint. To the contrary, to prove *res judicata,* BP will have to contradict the pleadings. Based on the documents filed and BP's *res judicata* argument, the Court finds that it is necessary to consider matters outside the pleadings in ruling on the pending motion and must now determine whether valid notice has been given to Grynberg, the nonmovant.

■ Grynberg did not object to the authenticity or admission of any of the extrinsic documents attached to BP's motion. Instead, in response, Grynberg attached additional materials beyond the pleadings: (1) a declaration; (2) email correspondence to the arbitrator; and (3) the Arbitration Award. The Court also held a hearing on the pending motion to dismiss, wherein both parties discussed and presented matters outside the pleadings. In addition, both parties have submitted additional reply briefings, and Grynberg has filed a book with the Court to provide additional background information, as well as the subsequent New York Appellate Division Opinion and Order. Based on the hearing, the extensive filings by both the parties, and the reliance of both parties on matters outside the pleadings, the Court finds that both Grynberg and BP have had adequate notice that the Court could consider matters outside the original pleadings.[42] Accordingly, pursuant to Rule 12(d), the Court converts BP's motion to dismiss to a motion for summary judgment.

### 2. Whether the Pending Claims Are Barred by Res Judicata

■ *Res judicata* "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *Duffie v. United States,* 600 F.3d 362, 372 (5th Cir.2010). Arbitration awards, like judicial court decisions, may have a preclusive effect on subsequent litigation. *See Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir.2001) ("It is well settled that [*res judicata* ] serves to bar certain claims in federal court based on the binding effect of past determinations in arbitral proceedings."); *Autotrol Corp. v. J–F Equip. Co.,* 820 F.Supp. 293, 297 (N.D.Tex.1993) (list-

---

**42.** Since the filing of the original motion to dismiss, Grynberg filed a response, BP filed a reply, Grynberg filed a surreply, Grynberg filed the book entitled *Vultures' Picnic,* BP filed a response to the filing of the book, Grynberg filed a reply to the filing of the book, Grynberg filed a Notice of the New York Appellate Division Opinion and Order, BP filed a response to the notice of the New York Appellate Division Order and Opinion, and finally Grynberg filed a reply to the notice of the New York Appellate Division Opinion and Order.

ing courts that have recognized the preclusive effect of arbitration awards). In order to prevail on the affirmative defense of *res judicata,* a party must show that each of the following elements is met: "(1) the parties in the subsequent action are identical to, or in privity with, the parties in the prior action; (2) the judgment in the prior case was rendered by a court of competent jurisdiction; (3) there has been a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits." *Duffie,* 600 F.3d at 372.[43] Grynberg does not contest the first or fourth elements of *res judicata.* Instead, Grynberg contends that the arbitrator did not have competent jurisdiction, nor was there a final judgment on the merits. Nonetheless, because *res judicata* is an affirmative defense, BP has the burden of proving each of these elements, and the Court will consider each one in turn.

*a. Whether the Parties Are Identical to, or in Privity with, the Parties of the Prior Action*

 *Res judicata* precludes litigation by parties that are identical to those in a prior action or those that are in privity with the parties of the private action. *See Aerojet–Gen. Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir.1975) ("Under the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative."). For purposes of

*res judicata,* privity "represents a legal conclusion that the relationship between the one who is a party to the record and the non-party is sufficiently close to afford application of the principle of preclusion." *Sw. Airlines Co. v. Tex. Int'l Airlines, Inc.,* 546 F.2d 84, 95 (5th Cir.1977).

 The Grynberg Plaintiffs in this case are identical to the "Claimants" in the Arbitration. "Respondents" in the Arbitration were BP Exploration Operating Company Limited ("BPX") and Statoil.[44] Four defendants in this lawsuit were not parties to the Arbitration: Browne, Sutherland, BP P.L.C., and BP America, Inc. Having dismissed Browne and Sutherland for lack of personal jurisdiction, the remaining two defendants who were not parties to the Arbitration are BP P.L.C., and BP America, Inc. Therefore, to bar Grynberg's claims against them based on the doctrine of *res judicata,* BP P.L.C. and BP American, Inc. must be in privity with either BPX or Statoil.

BP P.L.C. is the parent company to BPX, which is a wholly-owned subsidiary of BP P.L.C. The Fifth Circuit has found that the relationship between a parent company and its wholly owned subsidiary meets the privity requirements for purposes of *res judicata.* *Jose v. United Eng'rs & Constructors, Inc.,* No. 94–20089, 1994 WL 708774, at *2 n. 1 (5th Cir.1994). Similarly, BP America, Inc. is a sister company to BPX, and other federal courts have found that this relationship can be

---

**43.** BP contends that it is not clear whether federal law or New York state law govern the issue of *res judicata* where New York law governed the arbitration, but the causes of action asserted in this case stem from federal law. *See Pike v. Freeman,* 266 F.3d 78, 91 n. 14 (2d Cir.2001). But the Fifth Circuit has typically applied the federal law of *res judicata* when the pending claims are brought under federal law. *See Sw. Airlines Co. v. Tx. Int'l Airlines, Inc.,* 546 F.2d 84, 94 (5th Cir. 1977); *Aerojet–Gen. Corp. v. Askew,* 511 F.2d

710, 715–18 (5th Cir.1975). This inquiry is not of significant import because "New York and federal preclusion law are materially the same." *Rafter v. Liddle,* 704 F.Supp.2d 370, 375 n. 6 (S.D.N.Y.2010).

**44.** *Compare Fifth Amended Complaint* at 1 *with The BP Defendants' Motion to Dismiss the Fourth Amended Complaint,* Exhibit 2 at 1 (*Settlement Agreement A,* Attachment No. 4). BP Exploration and Statoil were the Respondents in the Arbitration. *Id.* at 1.

sufficient to satisfy the requirement of privity. *E.g., In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 19 (1st Cir.2003). Moreover, Grynberg does not dispute the privity of these parties. Accordingly, this Court finds that this element is satisfied.

### b. *Whether the Judgment Was Rendered by a Court of Competent Jurisdiction*

■ Grynberg's primary argument against *res judicata* is that the arbitrator did not have competent jurisdiction to decide the civil RICO claims. Grynberg states that the arbitrator "determined that he had neither the power nor authority to decide a Civil RICO claim."[45] Grynberg contends that the record is replete with evidence showing that the arbitrator refused to decide the criminality of the alleged bribes and therefore, did not fully assert jurisdiction over the issue.[46] But well-established Supreme Court precedent, the 1999 Settlement Agreements, the D.C. RICO litigation, the Arbitration Award, and the recent New York Appellate Division Opinion and Order all contradict Grynberg's argument and show instead that the arbitrator did have jurisdiction over the civil RICO claims.

First, the Supreme Court of the United States has expressly held that Civil RICO claims may be subject to arbitration. *Shearson v. McMahon,* 482 U.S. 220, 242, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

Second, pursuant to the 1999 Settlement Agreements Grynberg expressly agreed to submit to arbitration any disputes "arising out of, in relation to or in any way connected with [the 1999 Settlement Agreement] or the Mutual Releases (whether contractual, tortious, equitable, statutory or otherwise)," thereby expressly granting the arbitrator jurisdiction to hear these civil RICO claims.[47]

Third, the United States District Court for the District of Columbia, after considering many of the same arguments put forth by Grynberg in this litigation, compelled the arbitration of the civil RICO claims, determining that the arbitrator himself had authority to determine whether or not jurisdiction existed over the civil RICO claims. *Grynberg,* 585 F.Supp.2d at 55–56. Specifically, in the D.C. RICO litigation, Grynberg contended that the arbitrator had already decided that he did not have jurisdiction over the claims because he could not decide issues of criminality. *Id.* The D.C. Court determined that the arbitrator's pre-Award statements to this effect—many of which are submitted as support of Grynberg's arguments here, including several emails between the parties and the arbitrator—were not sufficient to show that the arbitrator lacked jurisdiction. This Court agrees with the D.C. Court.

Fourth and most importantly, the Arbitration Award itself expressly accepts jurisdiction of the civil RICO claims. The arbitrator states, "under the broad arbitration provisions contained in the Settlements Agreements the undersigned has the authority to decide civil RICO

---

**45.** *E.g., Plaintiffs' Surreply Brief in Further Opposition of the BP Defendants Motion to Dismiss* at 3.

**46.** In its response, Grynberg attaches several emails to support its contention that the arbitrator denied having jurisdiction because he refused to determine the criminality of the alleged bribes. *Plaintiffs' Brief in Opposition to the BP Defendants' Motion to Dismiss the Fourth Amended Complaint,* Exhibits B & C.

**47.** *The BP Defendants' Motion to Dismiss the Fourth Amended Complaint,* Exhibit 1 at 65, § 10.04(a) *(1999 Settlement Agreement ).* To the extent that this Court has jurisdiction over Statoil the language within Statoil's 1999 Settlement Agreement is identical. *Motion to Dismiss of Statoil ASA,* Exhibit B2 at 59, § 10.04(a) *(1999 Settlement Agreement ).*

claims." [48] While the arbitrator goes on to state that he does not have the power or authority to decide whether a crime was committed,[49] he proceeds to analyze the claims, makes a final determination, and issues the Arbitration Award, including ample discussion of his consideration of the civil RICO claims. Weighing all of this in toto, including the evidence submitted by Grynberg, this Court determines that the arbitrator's express acceptance of jurisdiction and his subsequent consideration of the civil RICO claims is determinative; any possible contradictory dicta is irrelevant.

Fifth, although the civil RICO claims were not appealed and were therefore not considered, the New York Appellate Division Opinion and Order that was recently issued supports a finding that the arbitrator had jurisdiction over the civil RICO claims. In the Order, the New York Appellate Division considered Award 4 of the Arbitration Award—the audit claims related to the deduction of the "production sharing fees" from the calculation of Grynberg's interest in the sale of the GKOF. The Appellate Division remanded the question of legality of the "production sharing fees" as it related to that specific portion of the award and the Appellate Divisions further ordered the arbitrator to determine if those payments were properly deducted from Grynberg's payout under the 1999 Settlement Agreement. Inherently, the Order acknowledges the arbitrator's ability to make a determination of legality. In other words, the Order acknowledges that the arbitrator had competent jurisdiction over the question of criminality even if he did not consider that

inquiry's effect on the civil RICO claims. Jurisdiction either exists or it does not. The fact that the arbitrator questioned his ability to determine one element of the civil RICO claims, does not deprive the Arbitration of jurisdiction, especially when his hesitation was unfounded. By ruling that the arbitrator had the authority to determine the criminality of the "production sharing fees," the New York Appellate Division solidified the arbitrator's jurisdiction over the civil RICO claims. For this Court to rule that the arbitrator did not have jurisdiction to decide the legality of the alleged bribes, would be to contradict the express ruling of the New York Appellate Division Order—something this Court refuses to do. Based on the foregoing, this Court finds that the Arbitration Award was a judgment rendered under competent jurisdiction and this element is satisfied.

### c. Whether There Has Been a Final Judgment on the Merits

■■■ Grynberg Plaintiffs argue that because the arbitrator refused to consider the legality of the alleged bribes, the Arbitration Award was not a final judgment on the merits. The Court is unpersuaded by this argument. On a daily basis courts across the country, including the Supreme Court of the United States, issue valid final judgments on narrow grounds, while refusing to analyze issues beyond the scope of what is necessary to make a judicial determination. *See, e.g., Hosanna–Tabor Evangelical Lutheran Church and Sch. v. Equal Emp't Opportunity Comm.,* 556 U.S. ——, 132 S.Ct. 694, 710, 181 L.Ed.2d 650 (2012) (ruling on narrow grounds and limiting the opinion to the

---

**48.** *The BP Defendants' Motion to Dismiss the Fourth Amended Complaint,* Exhibit 2 at 22, ¶ 8 (*Arbitration Award*).

**49.** Specifically, the arbitrator states: "Although under the broad arbitration provisions

contained in the Settlements Agreements, the undersigned has the authority to decide civil RICO claims, neither an arbitrator nor an independent auditor has the power or authority to decide whether Respondents, either directly or indirectly, committed a crime." *Id.*

specific issue presented). Accordingly, the Court finds that this type of judicial restraint—ruling only on the issues necessary to properly dispose of a dispute—is common and does not make the ruling any less of a final decision on the merits.

Moreover, to prevail on a civil RICO claim, a plaintiff must prove an injury was proximately caused by the underlying criminal RICO activity. *Daniel v. Hay,* No. 94–40721, 1995 WL 314380, at *4 (5th Cir. May 11, 1995). Known as "RICO standing," the requirement that a plaintiff show injury and proximate causation to establish a civil RICO claim has been recognized as a part of the substantive merits of the law suit, not a procedural requirement. *See Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 117 (2d. Cir.2003) (explaining that dismissal of a civil RICO claim for lack of RICO standing is an adjudication on the merits because "RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim"). Here, the arbitrator dismissed the civil RICO claims because he determined that no injury existed, thereby ruling on the merits of the claims:

> Even if the "signature bonuses" that BP paid, which the independent auditor allowed BP to deduct as costs in the calculation of its Net Sales Proceeds, were proven to be bribes rather than BP's share of the signature bonus that the Consortium agreed to pay to the Kazakh government as a fee for being awarded the exploration and development rights in the Kashagan Oil Field, there is no basis to find that Claimants suffered any damages by reason of the alleged bribes.... Because the making of these payments, whether legal or illegal, may have been a condition of the Consor-

tium's obtaining the right to explore for oil and gas in the Kashagan Oil Field, if those payments had not been made, it may be that [BP and Statoil] would never have made the profits that they made and shared with [Grynberg].[50]

The arbitrator went on to dismiss the Grynberg Plaintiff's civil RICO claims "because [Grynberg] did not suffer any damages as a result of [BP and Statoil's] alleged RICO violations."[51] As explained by now-Justice Sotomayor in *Lerner,* this is not a jurisdictional determination, but rather a decision on the merits. Accordingly this Court finds that this element of *res judicata* has been satisfied.

### d. Whether the Same Claim or Cause of Action Is Involved

 The Fifth Circuit uses "a transactional test to determine whether two cases involve the same claim or cause of action." *Ramos v. United States,* 455 Fed.Appx. 424, 426 (5th Cir.2011). The Fifth Circuit has explained the transactional test:

> Under the transactional test, a prior judgment's preclusive effect extends to all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose. What grouping of facts constitutes a "transaction" or a "series of transactions" must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Test Masters Educ. Servs. v. Singh,* 428 F.3d 559, 571 (5th Cir.2005). The Com-

---

**50.** *Id.*

**51.** *Id.* (discussing the "D.C. RICO Claim"); *see also id.* at 24, ¶ 9 (explaining that the

"Grynberg's RICO Claim" would also have to be dismissed "for the same reasons").

plaint alleges three violations of federal RICO: (1) a violation of 18 U.S.C. § 1962(b); (2) a violation of 18 U.S.C. § 1962(c); and (3) a violation of 18 U.S.C. § 1962(d). All of these RICO claims are based on the alleged bribery scheme to Kazakh government officials. Similarly, the Arbitration Award describes two sets of RICO claims—the "D.C. based RICO Claim"[52] and "Grynberg's RICO Claim,"[53] —both of which the arbitrator describes as being "based in part on [Grynberg's] theory that [BP Defendants] are guilty of having paid bribes to Kazakh government officials in violation of the U.S. Foreign Corrupt Practices Act."[54] While some differences may be alleged or plead in the Complaint now before the Court, under the transactional test adopted by the Fifth Circuit, this Court determines that the claims brought in this litigation are the same claims or causes of action that were addressed in the Arbitration. Therefore, having determined that each element is satisfied, the Court determines that the claims brought before this Court are precluded by the doctrine of *res judicata* and should be dismissed.[55]

### IV. CONCLUSION

Based on the foregoing, the Court hereby

ORDERS that the Motion to Dismiss the Fourth Amended Complaint for Lack of Personal Jurisdiction and for Insufficiency of Service of Process, or in the Alternative, to Quash Service is GRANTED. The Court further

ORDERS that The BP Defendants' Motion to Dismiss the Fourth Amended Complaint is GRANTED. The Court further

ORDERS that the Motion to Dismiss of Statoil, ASA is GRANTED.

The Court will issue a Final Judgment in a separate order.

### FINAL JUDGMENT

Because the Court has dismissed all claims asserted in this lawsuit by Plaintiffs Jack J. Grynberg, Grynberg Production Corporation (a Texas corporation), Grynberg Production Corporation (a Colorado corporation), and Pricaspian Development Corporation against Defendants BP P.L.C. d/b/a BP Corp. North America, BP American Inc., BP Exploration Operating Company, Dens Norske Stats Oljeselskap ASA a/k/a Statoil ASA, Peter Sutherland, and Lord John Browne, the Court hereby

ORDERS that Plaintiff's case is DISMISSED.

THIS IS A FINAL JUDGMENT.

---

**52.** *The BP Defendants' Motion to Dismiss the Fourth Amended Complaint*, Exhibit 2 at 21, ¶ 8.

**53.** *Id.* at 22, ¶ 89.

**54.** *Id.* at 23, ¶ 9.

**55.** To the extent that this Court does have jurisdiction over Statoil, the foregoing analysis applies equally to Statoil, and all claims against them are also dismissed.